SULLIVAN, Justice,
dissenting.
Like Special Judge Kenneth G. Todd, I believe that application of the live-operator requirement in the present case imposes a material burden on political speech in violation of Art. I, § 9, of the Indiana Constitution.[1] And I further believe that appli *808 cation of this requirement violates the First Amendment to the United States Constitution. I therefore respectfully dissent.
I
In Price v. State, we held that Art. I, § 9, of the Indiana Constitution enshrines political speech as a core value — one of a cluster of essential values within our Bill of Rights that the Legislature may not “materially burden.” 622 N.E.2d 954, 963 (Ind.1993). We acknowledged that the same provision contains a responsibility standard, permitting the Legislature to sanction individuals who “abuse” their right to engage in political speech. Id. at 958. But we concluded in that case that because Colleen Price’s speech — objecting to police conduct — was in fact political and because her conduct could not be considered an abuse under the circumstances, her arrest and criminal conviction for disorderly ■ conduct unconstitutionally burdened her right to engage in political speech. Id. at 961, 964-65.
As the Court acknowledges, there is no dispute that the speech in this case is political. In fact, ever since the congressional campaign in 2006, the intention of the Attorney General has been clear — to enforce the Autodialer Law’s live-operator requirement against FreeEats’s automated political calls and the political speakers using such calls. See Appellee’s App. 303-04 (letters from the Attorney General's office sent in August and September, 2006, to Indiana’s political parties informing them of the Autodialer Law’s requirements). The question then is whether the live-operator requirement imposes a material burden on FreeEats’s and its clients’ rights under the Indiana Constitution to engage in political speech. Unlike federal constitutional analysis, our “ ‘[mjaterial burden’ analysis involves no ... weighing nor is it influenced by the social utility of the state action at issue.” Pnce, 622 N.E.2d at 961 n. 7. Instead, Price provides two considerations: “state action does not impose a material burden on expression if either the ‘magnitude of the impairment’ is slight or the expression threatens to inflict ‘particularized harm’ analogous to tortious injury on readily identifiable private interests.” Whittington v. State, 669 N.E.2d 1363, 1370 (Ind.1996) (internal citations omitted).
With regard to the “magnitude of the impairment,” the Court correctly recognizes that the right need not be totally blocked by the restriction; instead, “ ‘a state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed.’ ” State v. Economic Freedom Fund, 959 N.E.2d 794, 806 (Ind.2011) (emphasis added) (citation omitted). But according to the Court, FreeEats has “fail[ed] to introduce any convincing argument that the result of the [live-operator] requirement is that its right to engage in political expression no longer serves the purpose for which it was designed.” Id. at 807. The Court says that this is because FreeEats’s only substantial-obstacle argument is an economic one and “[t]his purely economic burden is not the type of substantial-obstacle that Price contemplated.” Id. at 807.
I disagree for several reasons.
First, although the Court accurately describes the procedural posture of this case, it is incorrect in concluding that the State has met the requisite burden of proof. In Whittington, we explained that the party *809 challenging a state restriction on his or her right to speak[2] bears the burden of proving that the State could not have reasonably concluded that the restricted expression was an abuse, but that the party may meet this burden by showing that the expressive activity was political. 669 N.E.2d at 1369. After making this showing, the burden then shifts to the State to “demonstrate that its action has not materially burdened the claimant’s opportunity to engage in political expression.” Id. (citing Price, 622 N.E.2d at 963-64). But Price and Whittington were criminal cases. The defendants in each brought Art. I, § 9, challenges to them convictions under the disorderly conduct statute based on their loud protests during police investigations. As such, there were genuine issues in those cases as to whether the speech at issue was political at all. In this case, there is — to repeat — no dispute that FreeEats has met its burden of showing that its restricted expression is political; under Price and Whittington, the burden then falls to the State to show that its action is not a material burden. By concluding that FreeEats has “fail[ed] to introduce any convincing argument that the result of the [live-operator] requirement is that its right to engage in political speech no longer serves the purpose for which it was designed,” the Court incorrectly places the burden on FreeEats to prove that the live-operator requirement is not a material burden.
Next, the Court’s limited view of Price diminishes the protections of Art. I, § 9, and does so with great consequences. As just noted in a different context, both Price and Whittington were challenges to convictions for loudly protesting police conduct. Price therefore did not contemplate or speak to “economic burdens” at all. But in this civil case, the Attorney General seeks to enforce the Autodialer Law’s live-operator requirement against a business. In civil cases, economic burdens diminish the protections of Art. I, § 9, in the same way that penal sanctions do in criminal cases. Moreover, the Court fails to appreciate the full extent of the “economic burden” imposed in this case. Unlike the punishment imposed on speech after it was spoken in Price and Whitting-ton, the live-operator requirement prevents political speech from occurring at all. This is because, as discussed more fully below, it eliminates an entire industry offering a specific service to political speakers. In this regard, the live-operator requirement arguably imposes an even greater burden on speech than criminal punishment. Cf Mishler v. MAC Sys., Inc., 771 N.E.2d 92, 95 (Ind.Ct.App.2002) (noting “that prior restraints on speech and publication are the most serious and the least tolerable infringement on free speech rights” (citing Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976))).[3]
The consequences of the Court’s limited view are even more troubling given what is at stake in this case — a business that provides a service to an unlimited number of *810 groups that wish to engage in efficient, effective political speech and that simultaneously allows a vast number of people to receive that political speech. FreeEats can contact 1.7 million Indiana voters in 7 hours, thereby, as discussed in Part II-B-3, infra, allowing political speakers to deliver their messages during the timeframes in which speech is most effective.[4] It enables candidates to respond to attack ads right before an election when no TV or radio airtime is available, providing candidates what might well be otherwise unavailable opportunities to defend themselves. It educates voters on the issues. It motivates them to turn out. Undoubtedly, it is one of the most important tools in today’s political dialogue.
Article I, § 9, prohibits burdens that are material enough to prevent political speech from being delivered — economic or not. Cf. Whittington, 669 N.E.2d at 1368 (noting that the focus of the free speech clause is on the “restrictive impact of state action” and that the clause is triggered when the “state imposes a direct and significant burden on a person’s opportunity to speak his or her mind”). The live-operator requirement imposes substantial costs on speakers. The record shows that it costs $0.15 per call without a live operator and $2.25 per call with a live operator — a 1,500% increase in cost. This means that although the market would allow the speaker to disseminate its message to roughly 6,667 potential listeners for $1,000, the State of Indiana requires that the speaker instead spend $15,000 to disseminate the same message to the same listeners — or, in this case, it would have cost FreeEats $900,000 to make its 400,000 calls with a live operator and only $60,000 without a live operator. This burden is so substantial that it eliminates an entire mode of widely used and effective communication from political discourse; it operates to shut down the entire automated political-call industry.
Automated political speech — as an outgrowth of door-to-door political campaigning, political telephone banks, and bulk mailings — is protected under Art. I, § 9. See id. (noting that “because the right to speak clause also provides that expressive activity may be ‘freely’ performed, the clause reaches every conceivable mode of expression” and that “speaking, writing, or printing, freely, on any subject whatever, includes, at least, the projection of any words in any manner ” (emphasis added)). By way of the live-operator requirement and the resulting elimination of this method of communication, the State is “dictating] the means by which political opinion may be voiced.” Price, 622 N.E.2d at 963. Specifically, it is dictating that political opinion may not be voiced through automated political calls. The “magnitude of the impairment” in this case could not be greater.
Finding that the “magnitude of the impairment” is slight, the Court does not address whether the speech at issue “threatens to inflict ‘particularized harm’ analogous to tortious injury on readily identifiable private interests.” Whitting-ton, 669 N.E.2d at 1370 (citation omitted). In any event, these telephone calls do not even come close to violating that standard. First, assuming that the simple act of making a telephone call could even rise to the level of tortious conduct, the calls in this case do not — they are made at reasonable *811 times, are only made up to three times per residence (and only then if the phone was not answered on the first two tries), and are disconnected fairly quickly upon termination of the call. Those who do not want to receive these calls suffer no harm that rises “above the level of a fleeting annoyance.” Price, 622 N.E.2d at 964. And, because no one person suffers harm that is different than anyone else, these calls do not inflict “particularized” harm as contemplated by Price. Cf. id. (concluding that the state imposes a material burden when it treats as an abuse political speech which does not harm any particular individual (“public nuisance”)). In the absence of particularized harm, the live-operator requirement imposes a material burden on FreeEats’s right to engage in political speech in violation of Art. I, § 9, of the Indiana Constitution.
II
The First Amendment prohibits the State from “abridging the freedom of speech.” U.S. Const, amend. I; McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Of course, the right to freedom of speech is not absolute, see, e.g., Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.), but governmental regulation of expression is permitted only in limited circumstances and only if the regulation satisfies the applicable standard of judicial scrutiny. Cf. United States v. Kokinda, 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion) (“Under our First Amendment jurisprudence, we must determine the level of scrutiny that applies to the regulation of protected speech at issue”).
A
The parties agree that this case involves private individuals or entities attempting to engage in core political speech on private property. But they dispute whether the statute is content based or content neutral.
Content-based laws are those that regulate speech based on its subject matter, its viewpoint, or the speaker’s identity. E.g., United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 811-12, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Content-based laws are thus particularly troubling because, at bottom, “the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Police Dep’t of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (citations omitted); see also Turner Broad. Sys., Inc. v. FCC (Turner I), 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). As a consequence, content-based regulations of protected speech are subject to the most exacting judicial scrutiny. E.g., Brown v. Entm’t Merchs. Ass’n, 564 U.S. -, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011); Turner I, 512 U.S. at 642, 114 S.Ct. 2445.
Content-neutral laws, on the other hand, are those that regulate speech irrespective of subject matter, viewpoint, or speaker identity, and they usually apply to all speech. See, e.g., Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Such laws are deemed to be less problematic under the First Amendment because “they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.” Turner I, 512 U.S. at 642, 114 S.Ct. 2445; see also Geoffrey R. Stone, Content-Neutral Restrictions, 54 U. Chi. L. Rev. 46, 54-57, 72-77 *812 (1987). At the same time, content-neutral speech regulations do burden important First Amendment interests because, by restricting speech, they limit the marketplace of ideas and quell public debate. See, e.g., City of Ladue v. Gilleo, 512 U.S. 43, 55, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). To balance these competing interests, the United States Supreme Court has held that content-neutral laws are subject to an intermediate level of scrutiny, which affords the government more leeway in meeting its legitimate regulatory objectives. See Turner I, 512 U.S. at 662, 114 S.Ct. 2445; see also Turner Broad. Sys., Inc. v. FCC (Tuner II), 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997); Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).
Unsurprisingly, FreeEats argues that the Autodialer Law is content based and that it is subject to heightened judicial scrutiny. Equally unsurprisingly, the State argues that the law is content neutral and that intermediate scrutiny applies. I find it is unnecessary to undertake this analysis here because I believe that the live-operator requirement is sufficiently burdensome that it fails intermediate scrutiny.
B
Intermediate scrutiny is, in the last analysis, a balancing test used to determine whether the State has appropriately balanced its other significant interests against the pertinent First Amendment interests, see Hill v. Colorada, 530 U.S. 703, 714-18, 120 S.Ct. 2480,147 L.Ed.2d 597 (2000), but it requires more than a simple judicial weighing of interests. Rather, a content-neutral law will be upheld under intermediate scrutiny only if it is narrowly tailored to serve a substantial governmental interest and leaves open adequate alternative channels of communication. See id. at 725-30, 120 S.Ct. 2480; Tuner II, 520 U.S. at 189, 117 S.Ct. 1174; Turner I, 512 U.S. at 662, 114 S.Ct. 2445; Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); Frisby v. Schultz, 487 U.S. 474, 481-82, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293-94, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); Taxpayers for Vincent, 466 U.S. at 804-05, 104 S.Ct. 2118; Heffron, 452 U.S. at 647-48, 101 S.Ct. 2559; Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Grayned v. City of Rockford, 408 U.S. 104, 115-17, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
B-l
A content-neutral regulation of speech must serve a substantial governmental interest unrelated to the suppression of expression. E.g., Community for Creative Non-Violence, 468 U.S. at 293-98, 104 S.Ct. 3065; O’Brien, 391 U.S. at 377, 380-81, 88 S.Ct. 1673. We acknowledged in State v. American Family Voices, Inc., that the general purpose of the Autodialer Law “is to protect the privacy, tranquility, and efficiency of telephone customers.” 898 N.E.2d 293, 295 (Ind.2008) (citation omitted). And the Supreme Court’s cases emphasize that protecting residential privacy is an important interest of the highest magnitude. See Watchtower Bible & Tract Soc’y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 164-65, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002); Hill, 530 U.S. at 715-18, 120 S.Ct. 2480; Ward, 491 U.S. at 796, 109 S.Ct. 2746; Frisby, 487 U.S. at 484-85, 108 S.Ct. 2495; Rowan v. U.S. Post Office Dep’t, 397 U.S. 728, 736-38, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970); Kovacs v. Cooper, 336 U.S. 77, 86-87, 69 S.Ct. 448, *813 93 L.Ed. 513 (1949) (plurality opinion); Martin v. City of Struthers, 319 U.S. 141, 147-48, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). But this only begins the analysis, for “[m]ere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.” Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939).
B-2
Under intermediate scrutiny, the speech regulation must be narrowly tailored to serve the government’s substantial interest in protecting residential privacy. E.g., Hill, 530 U.S. at 726, 120 S.Ct. 2480; Turner I, 512 U.S. at 662, 114 S.Ct. 2445; Ward, 491 U.S. at 797-98, 109 S.Ct. 2746; Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 477-80, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). A law is narrowly tailored if it “promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest.” Turner II, 520 U.S. at 213-14, 117 S.Ct. 1174 (emphasis added) (citation and internal quotation marks omitted). There are thus two parts to this test: First, the regulation must be effective in achieving the State’s substantial regulatory objective. Second, the regulation must not burden substantially more speech than is necessary to achieve its regulatory objective. Accordingly, the Autodialer Law will satisfy this factor if it “targets and eliminates no more than the exact source of the ‘evil’ it seeks to remedy,” Frishy, 487 U.S. at 485, 108 S.Ct. 2495, and it will not be invalidated “simply because there is some imaginable alternative that might be less burdensome on speech,” United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (citation omitted). Metaphorically speaking, this means that although the State is not required to use a scalpel, it may not use a wrecking ball. And to be sure, a regulation that effectively prohibits speech (by driving up the cost 1,500%) is such a wrecking ball.
B-2-a
I turn first to five decisions of the United States Supreme Court addressing the constitutionality of content-neutral regulations of speech justified by a governmental interest in protecting privacy. These cases together stand for the proposition that regulations to protect privacy must be tailored so as to allow unwilling listeners to avoid the speech while allowing willing listeners to receive the speech. See Watchtower, 536 U.S. 150, 122 S.Ct. 2080; Hill, 530 U.S. 703, 120 S.Ct. 2480; Frisby, 487 U.S. 474, 108 S.Ct. 2495; Martin, 319 U.S. 141, 63 S.Ct. 862; cf Rowan, 397 U.S. 728, 90 S.Ct. 1484. Regulations intended to protect unwilling listeners are permitted to burden the rights of speakers and willing listeners only where an insurmountable “captive audience” problem exists. See Ward, 491 U.S. 781, 109 S.Ct. 2746; Kovacs, 336 U.S. 77, 69 S.Ct. 448; cf Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 72, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (“The First Amendment ‘does not permit the government to prohibit speech as intrusive unless the “captive” audience cannot avoid objectionable speech.’” (citation omitted)).
1. The ordinance in Martin v. City of Stntthers imposed an absolute ban on all door-to-door canvassing and distribution of literature. 319 U.S. at 142, 63 S.Ct. 862. The Struthers ordinance attempted “to protect the interests of all of its citizens, whether particular citizens want[ed] that protection or not,” id. at 143, 63 S.Ct. 862, and thereby substituted “the judgment of *814 the community for the judgment of the individual householder,” id. at 144, 63 S.Ct. 862. The result was that a speaker could be subject “to criminal punishment for annoying the person on whom he call[ed], even though the recipient of the literature distributed [was] in fact glad to receive it.” Id. The Court held that this went too far by prohibiting too much speech:
Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved. The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide ivhether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas.
Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off.... We know of no state which, as does the Strutters ordinance in effect, makes a person a criminal trespasser if he enters the property of another for an innocent purpose without an explicit command from the owners to stay away. The National Institute of Municipal Law Officers has proposed a form of regulation to its member cities which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed. This or any similar regulation leaves the decision as to whether distributers of literature may lawfully call at a home where it belongs — with the homeowner himself. A city can punish those who call at a home in defiance of the previously expressed will of the occupant.... In any case, the problem must be worked out by each community for itself with due respect for the constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributors from the home.
Id. at 146-49, 63 S.Ct. 862 (emphasis added) (footnotes omitted).
2. The ordinance in Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, did not impose a flat ban on door-to-door canvassing, but it did prohibit door-to-door canvassing without first obtaining a permit from the mayor’s office. 536 U.S. at 154, 122 S.Ct. 2080. The permit was issued without charge and as a matter of course — it was not a discretionary licensing scheme. Id. at 154-55, 122 S.Ct. 2080; cf. Forsyth County v. Nationalist Movement, 505 U.S. 123, 129-33, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); Cox v. Louisiana, 379 U.S. 536, 554-58, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Cantwell v. Connecticut, 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schneider, 308 U.S. at 163-64, 60 S.Ct. 146; Lovell v. City of Griffin, 303 U.S. 444, 451-52, 58 S.Ct. 666, 82 L.Ed. 949 (1938). The Court declined to determine whether the ordinance was content based or content neutral, instead reasoning that “the breadth of speech affected by the ordinance and the nature of the regulation” rendered it invalid under any level of First Amendment scrutiny. Watchtower, 536 U.S. at 164, 122 S.Ct. 2080. The Village argued that the ordinance served three interests, including the protection of residential privacy. Id. at 164-65, 122 S.Ct. 2080. Although this was an important interest, the Court concluded that the ordinance was not narrowly tailored because another section of the ordinance that allowed residents to post “No Solicitation” signs on their property and “the resident’s unques *815 tioned right to refuse to engage in conversation with unwelcome visitors” together provided ample protection for unwilling listeners. Id. at 168, 122 S.Ct. 2080 (citation omitted); see also Watchtower Bible & Tract Soc’y of N.Y., Inc. v. Vill. of Stratton, 240 F.3d 553, 571 (6th Cir.2001) (Gilman, J., concurring in part and dissenting in part) (finding under intermediate scrutiny that the ordinance was not narrowly tailored to serve the interest in protecting privacy because there were other ample protections of privacy), rev’d, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002).
3. In Frisby v. Schultz, the Court held that an ordinance prohibiting picketing occurring in public streets directed at a single residence or dwelling was not facially invalid under the First Amendment. 487 U.S. at 488, 108 S.Ct. 2495. The Court accepted the view of the lower courts that the ordinance was content neutral and thus subjected it to intermediate scrutiny. Id. at 482, 108 S.Ct. 2495. The ordinance served a substantial governmental interest in protecting the residential privacy of presumptively unwilling listeners. Id. at 484-85, 108 S.Ct. 2495. This ban on picketing directed toward a single residence of a presumptively unwilling listener was narrowly tailored because the “evil” of such picketing was “the very presence of an unwelcome visitor at the home,” id. at 487, 108 S.Ct. 2495 (citation and internal quotation marks omitted), and thus was “created by the medium of expression itself,” id. (citation and internal quotation marks omitted). Moreover, because the scope of the ban was so narrow, ample alternative channels of communication were available. Id. at 483-84,108 S.Ct. 2495.
4. In Hill v. Colorado, the Court upheld as a reasonable time, place, or manner regulation a Colorado statute that made it unlawful for a person within 100 feet of a health care facility’s entrance to
“knowingly approach” within eight feet of another person, without that person’s consent, in order to pass that person a leaflet or handbill, to display to that person a sign, or to engage in oral protest, education, or counseling with that person. 530 U.S. at 707, 725, 120 S.Ct. 2480. The Court held that the statute was content neutral, id. at 719-25, 120 S.Ct. 2480, and that it served the substantial governmental interest of protecting unwilling listeners’ privacy as they sought medical treatment, id. at 715-18, 120 S.Ct. 2480. The statute was narrowly tailored, in large part, because “only attempts to address unwilling listeners [were] affected.” Id. at 727, 120 S.Ct. 2480. Finally, “the 8-foot restriction on an unwanted physical approach [left] ample room to communicate a message through speech” because “[s]igns, pictures, and voice itself [could] cross an 8-foot gap with ease.” Id. at 729, 120 S.Ct. 2480. And the eight-foot restriction applied only within 100 feet of a health care facility, where the restriction was most needed, and thereby interfered far less with speakers’ ability to communicate than did the total ban in Frisby or other restrictions previously sustained by the Court. Id. at 730,120 S.Ct. 2480.
5. The federal statute at issue in Rowan v. United States Post Office Department allowed postal customers essentially to request that they be placed on a mailer’s do-not-mail list — in other words, the statute “was intended to allow the addressee complete and unfettered discretion in electing whether or not he desired to receive further material from a particular sender.” 397 U.S. at 734, 90 S.Ct. 1484. The Court held that the statute did not violate the First Amendment because, even, though the First Amendment protects the speaker’s right to communicate, that right “must stop at the mailbox of an unreceptive addressee.” Id. at 737, 90 S.Ct. 1484. The Court relied heavily on *816 Martin and noted that “the mailer’s right to communicate [was] circumscribed only by an affirmative act of the addressee giving notice that he wishe[d] no further mailings from that mailer.” Id. Although the statute had “the effect of impeding the flow of ideas, information, and arguments that, ideally, [the addressee] should receive and consider,” id. at 736, 90 S.Ct. 1484, the Court reasoned that “no one has a right to press even ‘good’ ideas on an unwilling recipient,” id. at 738, 90 S.Ct. 1484.
B-2-b
The Indiana Autodialer Law is not narrowly tailored because it burdens substantially more speech than is necessary to serve the State’s interest in protecting residential privacy. The statute is clearly more akin to the ordinances struck down in Watchtower and Martin; it lacks the narrow tailoring of the laws upheld in Hill, Frisby, and Rowan.
The ordinance in Martin was invalid because it took the majority’s view that door-to-door canvassers were undesirable and imposed that view upon the entire community, thereby depriving the individual homeowner of his or her right to determine which messages to consider. 319 U.S. at 147-48, 63 S.Ct. 862. Moreover, in both Martin and Watchtower, there existed alternative means of protecting residential privacy, such as “no trespassing” signs and the unwilling listener’s right to refuse to engage in discussion with unwelcome speakers. Watchtower, 536 U.S. at 168, 122 S.Ct. 2080; Martin, 319 U.S. at 147-48, 63 S.Ct. 862; see also Sorrell v. IMS Health Inc., 564 U.S.-, 131 S.Ct. 2653, 2670, 180 L.Ed.2d 544 (2011) (“Personal privacy even in one’s own home receives ‘ample protection’ from the ‘resident’s unquestioned right to refuse to engage in conversation with unwelcome visitors.’ ” (quoting Watchtower, 536 U.S. at 168, 122 S.Ct. 2080)).
The challenged laws in Hill, Frisby, and Rowan, on the other hand, were upheld because they protected only unwilling listeners while leaving willing listeners free to receive the speaker’s message. Speakers in Hill could obtain a potential listener’s consent by asking for it when he or she walked by — it was thus rather simple for a potential listener to opt-out of the statute’s protections. 530 U.S. at 726-29, 120 S.Ct. 2480; see also id. at 715-16, 120 S.Ct. 2480 (“It is also important when conducting this interest analysis to recognize the significant difference between state restrictions on a speaker’s right to address a willing audience and those that protect listeners from unwanted communication. This statute deals only with the latter.”); id. at 727, 120 S.Ct. 2480 (reiterating this point). Conversely, the do-not-mail list upheld in Rowan presumed that potential listeners wanted to receive the speaker’s message and those who were unwilling to do so could simply opt-in to the law’s protections by requesting the Postmaster General to place their names on a mailer’s do-not-mail list. 397 U.S. at 736-38, 90 S.Ct. 1484 (discussing the right of the individual householder to exercise exclusive control over unwanted mail). And in Fris-by, the Court analyzed the ordinance on the presumption that it would prohibit targeted picketing at an unwilling listener’s residence. 487 U.S. at 485, 108 S.Ct. 2495 (considering whether the ordinance was “narrowly tailored to protect only unwilling recipients of the communications” (emphasis added)). Indeed, the Court suggested that the ordinance would not apply if such picketing were directed toward the residence of a willing listener. Id. at 488, 108 S.Ct. 2495.
The State argues that the consent requirement of Indiana Code section 24-5-14-5(b) is simply an opt-out law of the type approved of in Hill. Hill might apply if section 5 required consent to receive a *817 prerecorded message but imposed no limitation on how such consent could be obtained. But that is not the case. Section 5 imposes a general consent requirement (with a few exemptions) and then proceeds to limit the manner in which consent may be obtained. Consent to hear a prerecorded message can be obtained either through prior interaction with the recipient or through the use of a live operator. As discussed in Part I, supra, the record shows that the live-operator requirement increases the speaker’s costs by 1,500%.[5] By doing so, the live-operator requirement effectively eliminates this useful medium of expression altogether. In point of fact, this is the live-requirement’s stated purpose. Appellant’s App. 14 (“The State concedes that limiting the total volume of automated calls made to Indiana residences is the sole purpose of requiring that consent be obtained by operators instead of an equally capable AIC system.”).
This raises another First Amendment issue. Undeniably, any regulation of speech has economic consequences in a broad sense. But in no case has the Supreme Court sustained a law with a financial impact similar to the one required by the Autodialer Law, and it has invalidated laws that subject speech to licensing taxes. See, e.g., Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (invalidating ordinance requiring door-to-door canvassers to pay a fee to and obtain a permit from the municipality before conducting its speech activities); Grosjean v. Am. Press Co., Inc., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (invalidating a state tax levied against newspapers). The only time the Court upheld a time, place, or manner restriction that involved a fee imposed on the speaker in order to speak was in Heffron v. International Society for Krishna Consciousness, Inc., where the state fair rented booths to speakers. 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). But the Court noted in a footnote that the propriety of the fee had not been raised and therefore passed no judgment on the issue. Id. at 644 n. 4,101 S.Ct. 2559. Moreover, it is reasonable to presume that the fee at issue there was nowhere near the cost imposed on speakers under the Autodialer Law, otherwise it likely would have been challenged.
B-3
The statute also fails intermediate scrutiny because it fails to leave open ample and adequate alternative channels of communication. As discussed in Part I, supra, prerecorded messages delivered by auto-dialers are a relatively inexpensive means of communication that allow speakers to get a message out quickly and effectively to all potential voters. As a result, they have become an extremely popular tool during political campaigns. Indeed, prerecorded messages delivered by autodialers *818 are unique in that they permit speakers to get a message out to particular listeners in a short period of time. And it is well-established that the actual effectiveness and practical utility of the supposed alternative channels of communication must be considered. See Linmark Assocs., Inc. v. Twp. of Willingboro, 431 U.S. 85, 93, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977).
With regard to the importance of the timing of political speech, the Supreme Court has noted the following:
[T]he public begins to concentrate on elections only in the weeks immediately before they are held. There are short timeframes in which speech can have influence. The need or relevance of the speech will often first be apparent at this stage in the campaign. The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others.
Citizens United v. FEC, 558 U.S.-, 130 S.Ct. 876, 895, 175 L.Ed.2d 753 (2010). The means for contributing to political debate, especially leading up to an election, must be able to be mobilized quickly. There are few, if any, substitute media for a speaker to employ in response to an opponent’s strategic last-minute attack advertisement. Moreover, important as the commercial media is to our democracy, the advent of the highly competitive 24-hour news cycle arguably has resulted in less reliability in the haste to be the first to “scoop” a potential story that will set a reporter or journalist apart from the rest of the pack. More-traditional methods of speech are therefore unlikely to provide an adequate replacement for prerecorded messages delivered by an autodialer, particularly when the speaker is from outside the State, such as a presidential candidate or an interest group. See generally Jason C. Miller, Note, Regulating Robocalls: Are Automated Calls the Sound of, or a Threat to, Democracy?, 16 Mich. Tele-comm. & Tech. L. Rev. 213 (2009), available at http://www.mttlr.org/volsixteen/ miller.pdf
Finally, assuming for the sake of argument that television and radio advertising have the mobility of prerecorded messages delivered by autodialers, those methods of speech have the effect of drowning out candidates and groups with fewer resources. The State is wrong when it argues that “[t]he Supreme Court has been quite clear that, where content-neutral laws are concerned, the relative efficiency of the affected medium of communication is irrelevant.” State’s Reply Br. 23 (citations omitted). In point of fact, the Supreme Court has often expressed concern about regulations that destroy a particularly useful and inexpensive medium of speech. See, e.g., Watchtower, 536 U.S. at 163-64, 122 S.Ct. 2080; Gilleo, 512 U.S. at 57, 114 S.Ct. 2038. In striking down the ban on door-to-door canvassing in Martin, the Court reasoned that “[d]oor to door distribution of circulars is essential to the poorly financed causes of little people.” 319 U.S. at 146, 63 S.Ct. 862. And in striking down a Colorado statute prohibiting the use of paid petition circulators, the Court wrote the following: *819 Meyer v. Grant, 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (citations omitted).
*818 That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. Colorado’s prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open “more burdensome” avenues of communication, does not relieve its burden on First Amendment expression. The First Amendment protects appellees’ right not only to advocate their cause but also to select what they believe to be the most effective means for doing so.
*819 Conclusion
I would hold that the Indiana Autodialer Law fails to satisfy the level of intermediate scrutiny applicable to content-neutral laws. And because the statute runs afoul of the First Amendment, it seems to me even clearer that it violates Art. I, § 9, of the Indiana Constitution, for when it comes to political speech, Price v. State provides Hoosiers broader protections than the First Amendment.

. The Court points out that the Autodialer Law has been enjoined by the Federal District Court on preemption grounds. Patriotic Veterans, Inc. v. State ex rel. Zoeller, 821 F.Supp.2d 1074, 2011 WL 4479071 (S.D.Ind.2011). While that issue is not before us in *808 this appeal, FreeEats did plead it in this case and so it will be before Judge Todd on remand.

. The party also bears the initial burden of proving that the State has in fact restricted his or her right to engage in expressive activity. Whittington, 669 N.E.2d at 1367.

. The term "prior restraint” describes " 'administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.' ” Mishler, 771 N.E.2d at 95 (quoting Alexander v. United States, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993)). Classic examples include restraining orders and injunctions that forbid future speech activities. Id. Regardless of whether the live-operator requirement meets the textbook definition of "prior restraint,” its effect in this case is comparable in that it prevents speech from occurring altogether.

. Live operators, as argued by FreeEats, could not replicate the speed of FreeEats’s technology. “If FreeEats were able to hire 200 operators and those operators worked 12-hour days placing an industry standard 20 calls per hour, it would take FreeEats approximately 425 hours, or 35 full-time days, to complete the same task as its [artificial intelligence] system.” Appellee FreeEats's Br. 13.

. This critical respect distinguishes this case from the decision in Van Bergen v. Minnesota, 59 F.3d 1541 (8th Cir.1995). In Van Bergen, the Eighth Circuit upheld under intermediate scrutiny a Minnesota statute almost identical to the Indiana Autodialer Law in a case that, like here, involved core political speech. Id. at 1545-46, 1549-56; see also Bland v. Fessler, 88 F.3d 729 (9th Cir.1996) (upholding similar California statute as applied to commercial speech); Moser v. FCC, 46 F.3d 970 (9th Cir.1995) (upholding Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, under intermediate scrutiny). The Eighth Circuit held that the statute was content neutral, that Minnesota had advanced a substantial interest in protecting residential privacy, that the law was narrowly tailored to advance that interest, and that the statute left open ample alternative channels for communication. Van Bergen, 59 F.3d at 1550-56. The panel in Van Bergen expressly rejected the argument that the live-operator requirement imposed an effective ban because it presented "only a marginally more costly option.” Id. at 1556. Here, the record shows that the live-operator requirement is far more than "marginally” more expensive.