**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana



FILED

Oct 02 2012, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SCOTT J. WELTON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 40A05-1202-CR-67 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE JENNINGS SUPERIOR COURT
The Honorable Gary Lee Smith, Judge
Cause No. 40D01-1012-CM-576

**October 2, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Scott J. Welton ("Welton") was convicted following a jury trial of resisting law enforcement[1] as a Class A misdemeanor and disorderly conduct[2] as a Class B misdemeanor. He appeals his convictions and sentence, raising the following consolidated and restated issues:

I. Whether sufficient evidence was presented at trial to convict him for resisting law enforcement and disorderly conduct; and

II. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the convictions reveal that Welton and a friend were remodeling Welton's home in Jennings County, Indiana. On October 22, 2010, a burn ban was in effect for Jennings County due to dry weather conditions. Around 2:00 a.m. on that date, Welton placed a pile of debris next to his house, lit it on fire, and the two men went back inside the house. An unknown person saw the flames and called the volunteer fire department.

Volunteer firefighters, including David Owsley ("Owsley"), an off-duty Indiana State Police Trooper, arrived at the scene and noted that the fire violated the county burn ban and, because of the items being burned, was also an illegal burn under state law. One of the firefighters knocked on Welton's door, but no one answered. Thinking they heard

---

[1] *See* Ind. Code § 35-44.1-3-1. Welton was convicted of resisting law enforcement under Indiana Code section 35-44-3-3. Without making substantive changes, Public Law 126-2012, Section 54, recodified that section as Indiana Code section 35-44.1-3-1, effective July 1, 2012.

[2] *See* Ind. Code § 35-45-1-3.

2

a woman scream, firefighters called the sheriff's department. When Welton saw the firefighters begin to extinguish the flames, he became irate and went outside and aggressively berated them. The firefighters explained that Welton had violated the burn ban, but that they would leave once the fire was out.

Welton, who firefighters suspected had been drinking, became more and more angry. Fire Chief Damon Land ("Chief Land") testified that Welton told firefighters to get off his land, spoke in a raised tone, "[got] in people's face," and even put his hand on a female firefighter's chest. *Tr.* at 73-74. Chief Land called dispatch to have deputies get to the scene more quickly.

Meanwhile, in an attempt to diffuse the situation, Owsley identified himself as an off-duty State Trooper and tried to calm down Welton, explaining that he would not get a citation for violating the burn ban. When these assurances somewhat pacified Welton, firefighters called sheriff's dispatch to inform them that the run was no longer an emergency.

Deputy Jason Bliton ("Deputy Bliton") and Deputy Tom Webster ("Deputy Webster") of the Jennings County Sheriff's Department responded to the call. After determining that the fire was an illegal burn, Deputy Bliton asked Welton for his identification ("ID") in order to issue him a citation. Having been told previously that he would not get a citation, Welton became angry, but said he needed to go inside to get his ID. Deputy Bliton sent Welton's friend to get the ID because he feared, from Welton's angry demeanor, that Welton might return with a weapon or barricade himself in the house. Welton said his friend would be unable to find the ID and kept trying to back up

toward the house.  Deputy Bliton told Welton to wait, but Welton turned to go into the house.  Deputy Bliton again asked Welton not to move, and when Welton ignored the request and continued to walk, Deputy Bliton grabbed Welton's arm.  Deputy Webster testified that Welton jerked his hand away with enough force that he was able to free himself from Deputy Bliton's hand.  *Tr*. at 82.

Deputy Bliton pushed Welton against the garage to gain control of him and, while Welton was being handcuffed, Welton's glasses fell off.  Deputy Bliton told Welton five or six times to calm down.  He then took Welton to a squad car while Deputy Webster looked for Welton's glasses.  On the way to the squad car, Welton began to resist more forcefully, fighting and kicking at nearby firefighters, and eventually "attempting to break free" to run toward a female firefighter.  *Id*. at 69, 138.

Deputy Bliton radioed Deputy Webster for help, and the two were able to get Welton into the front seat of the squad car only after a struggle, which caused Welton's pants to fall to mid-thigh.  Deputy Bliton buckled Welton into the front passenger seat[3] and drove him to the jail, while Deputy Webster followed in another vehicle.  During the drive, Welton became very agitated and was yelling and screaming, saying that it wasn't right that he was going to jail.  Deputy Bliton asked Welton to calm down and face forward.  Welton calmed down for a short time then continued to yell and scream, which hurt Deputy Bliton's ears.  That's when Deputy Bliton felt something wet hit the side of his face.  The disturbance was so bad that Deputy Bliton had trouble controlling the car,

---

[3] Welton was placed in the front seat because the squad car was not equipped to safely transport potentially violent riders in the back.  *Tr*. at 87-88.

4

braking and swerving as he tried to drive and keep Welton under control. Eventually, Deputy Bliton pulled out his taser and warned Welton, if he didn't calm down, he would be tased. Welton did not heed the warning, and Deputy Bliton applied the taser for a five second burst. This apparently kept Welton under control until they got to the jail.

Once they arrived at the jail, Deputy Webster went to the front passenger door, but Welton refused to get out until his pants were pulled up. Deputy Webster informed him that he would not be able to pull Welton's pants up until he got out of the car, but Welton again refused. Deputy Webster grabbed Welton and began to bring him out of the car, but Welton kicked or pushed and caused the two men to fall to the ground. When they got up, Deputy Webster realized that his shirt was ripped and he had lacerations on his right arm and Welton was bleeding from a laceration above his right eye. Deputy Webster then pulled Welton's pants up. As Deputy Webster and the jail staff tried to walk Welton into the jail, Welton lifted-up his legs, making it much more difficult to move him. They finally managed to put him in a padded cell.

The State charged Welton with resisting law enforcement and disorderly conduct, and Welton was convicted of both counts. The trial court sentenced him to one year on the resisting law enforcement conviction, with 185 days suspended to probation, and 180 days on the disorderly conduct conviction, with 180 days suspended to probation. The trial court ordered the sentences to run consecutively for a total of 180 days executed in the Jennings County Jail, followed by 365 days on probation. The trial court allowed Welton to be released on bond pending appeal. Welton appeals both his convictions and his sentence. Additional facts will be added where necessary.

5

**DISCUSSION AND DECISION**

**I.       Sufficiency of the Evidence**

On appeal, Welton argues that the State did not present sufficient evidence to support his convictions. When reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. *McCarter v. State*, 961 N.E.2d 43, 45 (Ind. Ct. App. 2012), *trans. denied*. Rather, we consider only the evidence most favorable to the judgment and the reasonable inferences supporting it. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010), *trans. denied*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*. It is not necessary that the evidence overcome every reasonable hypothesis of innocence; the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

*A.       Resisting Law Enforcement*

For the State to convict Welton of resisting law enforcement, it was required to prove beyond a reasonable doubt that he knowingly or intentionally forcibly resisted, obstructed, or interfered with a law enforcement officer while the officer was lawfully engaged in the execution of the officer's duties. *Lopez v. State*, 926 N.E.2d 1090, 1092 (Ind. Ct. App. 2010), *trans. denied* (citing predecessor to Ind. Code § 35-44.1-3-1). Welton cites to *Graham v. State,* 903 N.E.2d 963 (Ind. 2009), *Berberena v. State,* 914 N.E.2d 780 (Ind. Ct. App. 2009), *trans. denied*, and *Aguirre v. State*, 953 N.E.2d 593 (Ind. Ct. App. 2011), *trans. denied*, as support for his argument that the State failed to

6

prove that he forcibly resisted. *Appellant's Br.* at 8-9.

The defendants in *Graham*, *Berberena*, and *Aguirre* were each convicted of resisting law enforcement, as a Class A misdemeanor. However, on appeal, these convictions were overturned on a finding that there was insufficient evidence that each defendant forcibly resisted. In *Graham*, the Indiana Supreme Court explained that "one 'forcibly resists' when 'strong, powerful, violent means are used to evade a law enforcement official's rightful exercise of his or her duties.'" 903 N.E.2d at 965 (quoting *Spangler v. State,* 607 N.E.2d 720, 723 (Ind. 1993)). In reversing the conviction, the Supreme Court held that "[w]hile even 'stiffening' of one's arms when an officer grabs hold to position them for cuffing would suffice, there is no fair inference here that such occurred." *Id*. at 966.

Berberena was convicted on the following evidence. A police officer saw Berberena walking down the street, pushing his fiancé in the head, and "gave several loud verbal commands" for Berberena to stop and to put his hands behind his back. 914 N.E.2d at 780-81. Berberena did not comply. The officer forcibly placed Berberena against the wall of a building, and had to struggle with him to grab his hands and place them in handcuffs. *Id*. at 781. Berberena was found guilty of resisting law enforcement. He appealed, contending that there was insufficient evidence that he forcibly resisted the officer. *Id*. Our court agreed, finding no evidence that Berberena stiffened his arms or otherwise "made threatening or violent actions" to contribute to the struggle. *Id*. at 782. In overturning the conviction, this court observed that the officer could not remember what Berberena was doing with his hands, and the struggle did not last very long. *Id*.

7

Finally, the *Aguirre* court overturned Aguirre's conviction after finding that the State had failed to present evidence that she used force or "made threatening or violent actions" to contribute to the struggle with the officer. 953 N.E.2d at 596. Though the officer testified that Aguirre "dove her hand into her purse," which was sitting on the hood of the car, this court concluded it is error as a matter of law to find "forcibly resists" to include all actions that are not passive. *Id.* at 596-97. We concluded that there was insufficient evidence of probative value from which the trial court could reasonably have found beyond a reasonable doubt that Aguirre committed resisting law enforcement as a Class A misdemeanor. *Id.* at 597.

While the Indiana Supreme Court has held that "'[i]t is error as a matter of law to conclude . . . that 'forcibly resists' includes all actions that are not passive[,]" *Graham*, 903 N.E.2d at 965 (quoting *Spangler*, 607 N.E.2d at 724), it has also made clear that "'[t]he force involved need not rise to the level of mayhem.'" *Graham*, 903 N.E.2d at 965. While the defendant's conviction for resisting law enforcement was reversed in *Graham, Berberena*, and *Aguirre*, the instant case is easily distinguished because Welton was not convicted for passive acts.

Deputy Bliton and Deputy Webster arrived at Welton's home in response to a call from firefighters. Deputy Bliton determined that Welton's fire was an illegal burn and requested Welton's ID in order to issue him a citation. *Tr.* at 130-31. Having previously been told that no citation would be issued, Welton became very agitated and very upset. *Id.* at 131. Stating that he did not have his ID on him, Welton tried to go inside the home. *Id.* at 132. Deputy Bliton, however, told Welton to stay outside and asked Welton's

8

friend to retrieve the ID. *Id.* Welton kept backing up toward the house, and Deputy Bliton asked him to stop. *Id.* at 81. At one point, Welton turned to go inside the house. *Id.* at 81, 133. Deputy Bliton again asked Welton not to move, and when Welton ignored the request and continued to walk, Deputy Bliton grabbed his arm. *Id.* at 81-82, 133. Deputy Webster testified that Welton jerked his hand away with enough force that he was able to free himself from Deputy Bliton's hand. *Id.* at 82.

A struggle ensued to get Welton under control, and during that struggle, Welton's glasses came off. *Id.* at 83. Deputy Bliton told Welton five or six times to calm down. *Id.* at 136. He then took Welton to a squad car while Deputy Webster looked for Welton's glasses. *Id.* at 84, 136. On the way to the squad car, Welton began to resist more forcefully, fighting, kicking at nearby firefighters, and eventually "attempting to break free" to run after a female firefighter. *Id.* at 69, 138.

Once they arrived at the jail, Deputy Webster went to the front passenger door, opened it, and asked Welton to get out. *Id.* at 92-93. Deputy Webster informed Welton that his pants could not be pulled up inside the car. *Id.* at 93. Welton replied, "Fuck you, I am not getting out of the car." *Id.* Deputy Webster told Welton that he could physically get out of the car on his own or Deputy Webster could assist him. *Id.* Again, Welton said, "I am not getting out of the fucking car until you pull my pants up." *Id.* Deputy Webster began to get Welton out of the car, but Welton "kicked or pushed or something," and "both went to the ground." *Id.* at 94. When they got up, Deputy Webster noticed that his shirt was ripped and he had lacerations on his right arm. *Id.* at 96.

9

While Welton contends that his actions were only a reaction to the deputies' disparaging treatment, we do not compare Welton's actions to those of the deputies. Instead, we focus on whether Welton's actions constituted forcible resistance. Here, Welton's actions were not the passive resistance described in *Graham*, *Berberena*, and *Aguirre*. In fact, Welton's actions went well beyond the "stiffening' of one's arms" that our Supreme Court in *Graham* noted would be sufficient proof of forcible resistance. 903 N.E.2d at 966. Viewed consistently with our standard of review, the evidence is clearly sufficient to sustain Welton's resisting law enforcement conviction.

## B. Disorderly Conduct

Welton argues that there was insufficient evidence that he engaged in disorderly conduct as a Class B misdemeanor. In Count II of Welton's information, the State alleged that Welton "did recklessly, knowingly, or intentionally engage in fighting and/or tumultuous conduct; did make unreasonable noise and continued to do so after being asked to stop; or did disrupt a lawful assembly of persons." *Appellant's App.* at 14 (citing Ind. Code § 35-45-1-3(a)). Prior to trial, Welton filed a motion to dismiss Count II on the basis that the State had failed to state with specificity the portion of the statute that Welton allegedly had violated. *Id.* at 26. The trial court denied Welton's motion on the basis that it was untimely filed. *Id.* at 3.

While Welton contends that the charging information did not set forth the facts forming the basis for the disorderly conduct charge, his main contention on appeal is that the speech on which his conviction likely rests was the type of political speech that cannot form the basis for a disorderly conduct conviction. *Appellant's Br.* at 16-17.

10

"Because one's conduct or expression may be free speech protected under the Indiana Constitution, an application of the disorderly conduct statute must pass constitutional scrutiny." *Barnes v. State*, 946 N.E.2d 572, 577 (Ind. 2011), *adhered to on reh'g*, 953 N.E.2d 473 (Ind. 2011). Appellate courts employ a two-step inquiry in reviewing the constitutionality of an application of the disorderly conduct statute as follows: (1) we "'determine whether state action has restricted a claimant's expressive activity'"; and (2) we "'decide whether the restricted activity constituted an 'abuse' of the right to speak.'" 946 N.E.2d at 577 (quoting *Whittington v. State,* 669 N.E.2d 1363, 1367 (Ind. 1996)). The first prong may be satisfied based solely on the police restricting a claimant's loud speaking during a police investigation. *Id.* The second prong hinges on whether the restricted expression constituted political speech. *Id.*

Following Welton's trial, the trial court instructed the jury, without objection, on the elements of disorderly conduct as follows: "Disorderly Conduct charged in Count II is defined by law as follows: A person who recklessly, knowingly or intentionally engages in fighting or in tumultuous conduct, commits [d]isorderly conduct, a Class B misdemeanor." *Tr.* at 214-15. Omitting any reference to making unreasonable noise or disrupting lawful assembly, the jury was specifically instructed:

> Before you may convict the Defendant, the State must have proven each of the following:
>
> 1. In Jennings County
> 2. the Defendant
> 3. recklessly, knowingly or intentionally
> 4. engaged in fighting or tumultuous conduct[.]

*Appellant's App.* at 60.

11

An analysis of political speech is necessary where a defendant is convicted for making unreasonable noise and continuing to do so after being asked to stop. The jury was not instructed that Welton's disorderly conduct arose from his speech. As such, we need not address the issue of whether Welton was improperly convicted for making statements that were protected as political speech. Instead, we address only the question of whether there was sufficient evidence that Welton recklessly, knowingly, or intentionally engaged in fighting and/or tumultuous conduct.

"Tumultuous conduct" has been defined by the legislature as "conduct that results in, or is likely to result in, serious bodily injury to a person or substantial damage to property." Ind. Code § 35-45-1-1. There are few Indiana cases that specifically apply the definition of tumultuous conduct to determine the sufficiency of the evidence supporting the conviction for disorderly conduct. In *Bailey v. State,* 907 N.E.2d 1003 (Ind. 2009), our Supreme Court, held that there was sufficient evidence of tumultuous conduct, based on the fact that serious bodily injury was likely, where an unarmed high school student approached a dean in an angry manner with his fists clenched at his sides and yelled obscenities in the dean's face, with the student only backing away when he saw a school police officer nearby. 907 N.E.2d at 1007. In *Whitley v. State,* 553 N.E.2d 511 (Ind. Ct. App. 1990), this court affirmed a disorderly conduct conviction arising out of a "neighborhood disturbance" between two groups of women. 553 N.E.2d at 512. After police arrived and separated the groups, Whitley continued to taunt the other group. *Id.* On appeal, she challenged whether yelling could be tumultuous conduct. This court held the language of the statute was unambiguous and Whitley's physical struggle with police

while they attempted to handcuff her and her conduct before her arrest, in each occasion, created the likelihood that serious bodily injury or substantial property damage would result. Specifically, we pointed to the racial nature of the confrontation and Whitley's persistence in yelling and taunting the other group, before her arrest, could have led to a fight between the groups. *Id.* at 513–514.

We find the following evidence is the kind of tumultuous conduct that the courts in *Bailey* and *Whitley* found to be sufficient to support a conviction for disorderly conduct. When Owsley arrived at the scene, he observed a fairly substantial fire, with no one attending it. *Appellant's App.* at 44. Owsley noted it was the kind of fire that "could have easily spread, the grass and . . . all the ground litter, you know leaves, things like that in the area were dry, . . . no hose out there, nobody watching it, it could have easily spread, uh, across the grass to a neighbor's residence . . . ." *Id.* The firefighters worked on the fire for about five or ten minutes before Welton came outside. *Id.* at 45. Once outside, Welton asked the firefighters why they were putting out the fire and, once firefighters explained the burn ban, Welton became extremely agitated. *Id.* at 45, 46. Owsley testified that Welton "was raising his voice, he was uh, flaying [sic] his hands as he was talking, um, he was starting to use some, um, foul language, um, he just, he appeared that, you could tell that he was unhappy that we were there." *Id.* at 46. Although the firefighters tried to calm Welton down, "he remained agitated, um, he had gotten into the face of several of our firefighters and he was nearly face to face, almost touching, um, he was pointing, almost poking the firefighters . . . ." *Id.* at 46. He was probably between six inches to a foot from some of the firefighters and poking at them.

13

*Id*. at 47. Owsley was concerned for the firefighters' safety because he thought Welton was going to hit one of the firefighters. *Id*. He also testified that Welton interfered with fighting the fire; since Welton was in an agitated state, Owsley sent some of the firefighters to the truck for their safety, which meant that fewer firefighters were working to put out the fire. *Id*. at 49.

Chief Land, who had been a firefighter for ten years, testified that when he arrived at the scene, he saw a fire that was five or six feet round and about six or seven feet high. *Id*. at 63, 64. The fire was burning ten to fifteen feet from a building—close enough that if left unattended, the building could have caught fire. *Id*. at 65. Chief Land also testified that Welton was "up in our [the firefighters'] faces and pointing his fingers . . . ." *Id*. at 67. Chief Land was concerned enough for the firefighters' safety that he called the sheriff's dispatch and asked that his previous call for assistance be changed to an emergency call.

From these facts, it is reasonable to conclude that substantial damage to property was likely to result from Welton's conduct, but for Owsley and, later, Deputy Bliton's timely intervention and removal of Welton from the scene. There is sufficient evidence that Welton engaged in tumultuous conduct so as to support his disorderly conduct conviction.

## II. Sentencing

Welton next appeals his sentence, blending an abuse of discretion argument with his primary objection that his sentence is inappropriate under Indiana Appellate Rule 7(B). *Appellant's Br*. at 22-27. In the interest of completeness, we first address Welton's

14

abuse of discretion argument.

Welton first contends that the trial court abused its discretion in ordering his sentences to run consecutively. *Appellant's Br.* at 19. "The decision to impose consecutive sentences lies within the discretion of the trial court." *Gilliam v. State,* 901 N.E.2d 72, 74 (Ind. Ct. App. 2009). We review such sentencing decisions for an abuse of discretion. *Townsend v. State*, 860 N.E.2d 1268, 1272-73 (Ind. Ct. App. 2007), *trans. denied.* An abuse of discretion occurs when the sentencing decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006).

The Indiana Supreme Court has held that "a trial court can impose consecutive sentences if warranted by the aggravating circumstances" under Indiana Code section 35-50-1-2. *Monroe v. State,* 886 N.E.2d 578, 579 (Ind. 2008). And a "single aggravating circumstance may justify the imposition of consecutive sentences." *Forgey v. State,* 886 N.E.2d 16, 23 (Ind. Ct. App. 2008). Welton argues that his health was a mitigating factor. The trial court, however, noted that there was no evidence that Welton, in fact, suffered from the claimed ailments. Furthermore, the aggravating factors—that Welton could have been charged with two counts of resisting law enforcement instead of just one, and that he had risked the safety of the officers and the general public—outweighed the mitigators. *Sentencing Tr.* at 27-28. Furthermore, the trial court concluded that the disorderly conduct conviction, which occurred at Welton's home, was a "separate and distinct" crime from his resisting law enforcement conviction, which occurred as he was

15

being arrested, in the car on the way to the jail, and at the jail. *Id*. at 28. Accordingly, the trial court did not abuse its discretion when it imposed consecutive sentences, and there is no basis for changing Welton's sentence on those grounds.

Welton also contends that his sentence was inappropriate. As an initial matter, we note that, of the total one and one-half-year sentence imposed for both convictions, Welton was only ordered to serve one-hundred eighty days in the Jennings County Jail, with the remainder suspended to probation. *See Davidson v. State*, 926 N.E.2d 1023, 1024 (Ind. 2010) (appellate review under Indiana Appellate Rule 7 may include consideration of totality of penal consequences found in trial court's sentence, *e.g.*, may also consider whether portion of sentence was ordered suspended). "A Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). The question under Indiana Appellate Rule 7(B) is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate. *Fonner v. State*, 876 N.E.2d 340, 344 (Ind. Ct. App. 2007). The defendant has the burden of persuading us that his or her sentence is inappropriate in light of the nature of the offense and the character of the offender. *Id*. at 343.

As to his character, Welton argues, without opposition, that he is forty-eight years old and has no other criminal convictions. *Appellant's Br.* at 20. Welton further contends that he has struggled with illness, including diabetes, Crohn's disease, and MERSA; conditions that will make it difficult for him to serve an executed jail sentence.

16

*Id.* During the sentencing hearing, however, the trial court pointed out that there was no evidence before the court from any medical personnel to confirm the existence of any of the purported health issues.

As to the nature of the offense, Welton asserts that his offenses were not egregious. *Id.* He states that he was the one who lost his glasses, suffered the degradation of riding with his pants around his thighs, and was tased by Deputy Bliton. We agree that, under the circumstances, Welton did not commit the most egregious of offenses, but his sentence reflects that. Welton was confrontational with firefighters, got in the face of individual firefighters, and, during a burn ban caused by drought, interfered with the prompt extinguishing of his fire. He also resisted Deputy Bliton and Deputy Webster as they attempted to lawfully perform their jobs. In light of the nature of the offense and the character of the offender, we cannot say that a sentence of 180 days executed was inappropriate.

Affirmed.

NAJAM, J., and MAY, J., concur.