## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Plainfield, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Day,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

March 15, 2016

Court of Appeals Case No.
24A05-1506-CR-724

Appeal from the Franklin Circuit
Court

The Honorable Clay M.
Kellerman, Judge

Trial Court Cause No.
24C02-1501-CM-70

**Robb, Judge.**

# Case Summary and Issue

[1] Following a bench trial, Michael Day was convicted of disorderly conduct as a Class B misdemeanor. Day appeals his conviction, raising the sole issue of whether the evidence is sufficient to support the conviction. Concluding the evidence is sufficient, we affirm.

# Facts and Procedural History[1]

[2] In January 2015, Day resided with his wife, M.D., and their two minor children, C.D. and J.D., in a home in Brookville, Indiana. Because of problems in the marriage and frequent arguments, the couple decided a divorce was necessary. M.D. described the couple's "fighting" as "name calling." Transcript at 6. A majority of the couple's recent frustrations existed because the couple agreed to sell the marital home, but Day wanted to list the house with a realtor and M.D. wanted to speak to an attorney before taking any action.

[3] On January 17, M.D. and J.D. were returning home from the movies when M.D. received a phone call from Day. When M.D. answered, Day said, "You f***ing bitch. I ought to kill you." *Id.* at 8. M.D. immediately hung up the phone and continued toward home. After arriving home, M.D. made a snack

---

[1] We held oral argument in this case on February 19, 2016 at Brownstown Central High School. We commend counsel for their advocacy and thank the faculty, staff, and students at the high school for their hospitality and participation.

for the children as they watched television in the living room; Day was not home. M.D. had to work the next morning, so she went to her bedroom and left the boys in the living room; the living room was located just outside the bedroom. Shortly thereafter, M.D. awoke to Day shouting out in the living room: "Where is your mother? Where is your mother?" *Id.* at 10. Day entered the bedroom and began "screaming at the top of his lungs . . . 'You f***ing bitch. You will sign these papers for the house.'" *Id.* Day was extremely angry and approached M.D. as she remained in bed. M.D. could smell alcohol on Day's breath.

[4] M.D. begged Day not to yell in front of the children, who were still in the living room. Day did not stop, and at some point, Day spit in M.D.'s face and then left the room. Fearful for her safety, M.D. called 911. After M.D. got off the phone with the 911 operator,[2] Day went upstairs and continued screaming. At this point, M.D. went to comfort her children who were "out on the couch crying, upset, scared . . . ." *Id.* at 16. Next, M.D. entered the kitchen where she was cornered by Day. Day said to M.D., "If you'd just sign the papers this would all be over with." *Id.* Thinking it was taking too long for the police to arrive, M.D. called 911 again; Day "just continued to yell." *Id.* at 17.

---

[2] After originally dialing 911, M.D. immediately hung up the phone before speaking with an operator because Day had reentered the room and she feared Day would find out she called 911. The 911 operator called M.D. back and asked if she needed assistance. M.D. originally declined assistance, but after a few moments, the 911 operator heard Day screaming. It was then that M.D. said she needed assistance.

[5] Franklin County Sheriff's Deputy Michael Strait and Sergeant Greg Melhbauer were dispatched to Day's residence. After exiting his vehicle, Deputy Strait looked through the home's glass front door and observed Day cornering M.D.; Day had his finger in M.D.'s face. While outside, Deputy Strait could hear Day screaming. After gaining entry to the house, Deputy Strait and Sergeant Melhbauer separated Day and M.D., and Day was arrested.

[6] On January 28, 2015, the State charged Day with disorderly conduct as a Class B misdemeanor, alleging Day engaged in fighting and/or tumultuous conduct under Indiana Code section 35-45-1-3. At trial, the State called M.D. and Deputy Strait as its only witnesses. The State also admitted the 911 audio recordings. At the conclusion of the State's evidence, Day moved for an acquittal, arguing the State did not meet its burden in proving he committed disorderly conduct. The trial court denied Day's motion, and Day subsequently testified in his own defense. Day admitted to screaming at M.D. and calling her a "f***ing bitch," but denied ever getting in her face, spitting in her face, or physically attacking her in any other way. *Id.* at 49. At the conclusion of the evidence, the trial court found Day guilty, stating, "If somebody won't sign . . . papers in a divorce, the answer isn't to come home and to get in a verbal altercation or be hostile, which absolutely . . . can be fighting . . . ." Tr. at 67. This appeal ensued.

# Discussion and Decision

Day contends the evidence is insufficient to support his conviction for disorderly conduct because the State failed to prove Day disrupted the public. Day claims the legislature, in enacting Indiana's disorderly conduct statute, intended to require a component of disrupting the public before one can be convicted of disorderly conduct. We disagree.

# I. Statutory Interpretation

## A. Standard of Review

Statutory interpretation is a question of law and is reviewed de novo. *Fight Against Brownsburg Annexation v. Town of Brownsburg,* 32 N.E.3d 798, 806 (Ind. Ct. App. 2015).

> Our primary goal in interpreting statutes is to determine and give effect to the Legislature's intent. The best evidence of that intent is a statute's text. The first step is therefore to decide whether the Legislature has spoken clearly and unambiguously on the point in question. When a statute is clear and unambiguous, we must apply the plain and ordinary meaning of the language. There is no need to resort to any other rules of statutory construction. As a result, we need not delve into legislative history if no ambiguity exists.

> But a statute is ambiguous when it admits of more than one reasonable interpretation. In that case, we resort to the rules of statutory construction so as to give effect to the Legislature's intent. For example, we read the statute as a whole, avoiding excessive reliance on a strict, literal meaning or the selective

reading of individual words. In a criminal case, we construe an ambiguous statute in favor of the defendant.

*Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012) (citations omitted).

## B. The Disorderly Conduct Statute

[9] Day contends "the statutory placement of the disorderly conduct statute in the article and chapter dealing with 'public' offenses, when compared to the broad language of the statute itself" renders the definition of the crime ambiguous. Brief of the Appellant at 7. In support of his argument that the statute is ambiguous, Day cites to the fact the legislature does not define the term "fighting." In addition, he cites to the statute's location in Title 35, Article 45, Chapter 1. Article 45 is entitled "Offenses Against Public Health, Order, and Decency," and Chapter 1 is entitled "Offenses Against Public Order."

[10] Indiana's disorderly conduct statute provides, in relevant part,

> (a) A person who recklessly, knowingly, or intentionally:
> (1) engages in fighting or in tumultuous conduct;
> (2) makes unreasonable noise and continues to do so after being asked to stop; or
> (3) disrupts a lawful assembly of persons;
> commits disorderly conduct, a Class B misdemeanor.

Ind. Code § 35-45-1-3(a). As Day points out, our legislature has not defined the term "fighting." When the legislature has not defined a word, we give the term its common and ordinary meaning. *Whaley v. State*, 843 N.E.2d 1, 11 (Ind. Ct. App. 2006), *trans. denied*. "In order to determine the plain and ordinary

meaning of words, courts may properly consult English language dictionaries." *Id.* Relevant here, we determined in *J.S. v. State*, 843 N.E.2d 1013, 1016 (Ind. Ct. App. 2006), *trans. denied*, the common and ordinary meaning of the term "fight" refers to "a '[h]ostile encounter; either physical or verbal in nature.'" *Id.* (alterations in original) (quoting Black's Law Dictionary 565 (5th ed. 1979)). The fact the legislature opted not to define the term "fighting" does not make the statute ambiguous, *see Adams*, 960 N.E.2d at 798, and Day does not argue how our previous definition of "fight" contributes to the statute's alleged ambiguity, *see J.S.*, 843 N.E.2d at 1016.

[11]    Next, we acknowledge Day's argument that the disorderly conduct statute is found in an article and chapter of the criminal code describing offenses against the public. However, Indiana Code section 1-1-1-5(f) specifically states,

> The headings of titles, articles, and chapters as they appear in the Indiana Code, as originally enacted or added by amendment, are not part of the law and may be altered by the lawful compilers, in any official publication, to more clearly indicate content. These descriptive headings are intended for organizational purposes only and are not intended to affect the meaning, application or construction of the statute they precede.

Because the statute's descriptive heading is not part of the law and is subject to alteration by lawful compilers, we give little, if any, weight to Day's argument the statute is ambiguous because the statute's headings suggest the legislature intended to criminalize only acts of disrupting the public.

[12]     Finally, we note Indiana's disorderly conduct statute was adapted from a similar provision of the Model Penal Code, which provided,

> (1)  A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> > (a) engages in fighting or threatening, or in violent or tumultuous behavior; or
> > (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or
> > (c)  creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor
>
> "Public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.

Model Penal Code § 250.2(1)(a) (1980) (emphasis in original); *see also Whittington v. State*, 669 N.E.2d 1363, 1367 (Ind. 1996) (noting Indiana's disorderly conduct statute is patterned on Section 250.2).  Although similar to Section 250.2, the statute departs from the language of the Model Code in important respects; namely, the legislature specifically omitted any reference to disrupting the "public."  *See Whittington*, 669 N.E.2d at 1367.

[13]     In *Whittington*, Whittington arrived home intoxicated and subsequently got into a verbal and physical altercation with his sister and her boyfriend inside; the sister was injured.  The police were called, and when the police arrived, Whittington continued to argue with the boyfriend.  The police also observed

that the sister was injured, and an ambulance was requested. After being told by police to be quiet and calm down, Whittington continued to act in a belligerent manner, and as a result, Whittington was arrested. Relevant here, all of this occurred inside a private residence, and there was no evidence that the sounds were detectable beyond the walls of the apartment, but there were others in the apartment who did not live there. The State charged Whittington with disorderly conduct under Indiana Code section 35-45-1-3(a), alleging he made unreasonable noise and continued to do so after being asked to stop. In determining whether the disorderly conduct statute applied to circumstances such as this, our supreme court first looked at the difference between the Model Penal Code and Indiana's disorderly conduct statute. The Court recognized the legislature specifically deleted any reference to the requirement a person disrupt the public and thereby held "the application of the statute can extend to situations in addition to those constituting public nuisance." *Id.* at 1367.

[14] We are not persuaded Indiana's disorderly conduct statute is ambiguous because the term "fighting" is undefined, nor are we persuaded its location in an article and chapter of the criminal code describing offenses against the public creates any ambiguity. Because the statute is not ambiguous, we will apply the plain and ordinary meaning of the language in the statute to determine whether the evidence is sufficient to support Day's conviction for disorderly conduct. *See Adams*, 960 N.E.2d at 798.

# II. Disorderly Conduct

## A. Standard of Review

[15] When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the judgment. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We neither reweigh the evidence nor reassess the credibility of witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). We will affirm a conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Drane*, 867 N.E.2d at 146-47 (citation omitted).

## B. Sufficiency of the Evidence

[16] To convict Day of disorderly conduct, the State was required to prove he "recklessly, knowingly, or intentionally . . . engage[d] in fighting or tumultuous conduct . . . ." Ind. Code § 35-45-1-3(a)(1). As noted above, we have previously defined the term "fighting" within the meaning of the disorderly conduct statute. *See J.S.*, 843 N.E.2d at 1016. In *J.S.*, a high school police officer was patrolling the hallway and witnessed J.S. grab a male student's hair and smack him with an open hand three times across his face. Assuming it was a fight, the officer intervened and arrested J.S; J.S. claimed she was just flirting with the boy. The State charged J.S. with disorderly conduct, alleging J.S. was "fighting at school." *Id.* After the delinquency hearing, the trial court entered a true finding of disorderly conduct, explaining the act of hitting the other student

two or three times constituted fighting within the meaning of the disorderly conduct statute.

[17] On appeal, J.S. argued the evidence was insufficient to support her conviction for disorderly conduct because "the officer's mistaken belief about [her] flirtatious behavior is not evidence of fighting to support an adjudication for disorderly conduct . . . ." *Id.* at 1015. Defining the term as a physically or verbally hostile encounter, we concluded the evidence was not sufficient to support J.S.'s conviction because the only evidence suggesting J.S. acted with hostility was the police officer's testimony that he assumed the pair were fighting.

[18] Unlike *J.S.*, the evidence supporting Day's conviction is more probative than a police officer's mere assumption. Before arriving home, Day called M.D., screaming "You f***cking bitch. I ought to kill you." Tr. at 8. When he arrived home, Day began screaming at M.D. in front of their children. Day continued to call M.D. a "f***cking bitch" and demanded she sign the papers to sell the house; Day claimed he would not allow M.D to leave until she signed the papers. While M.D. pleaded with Day to stop screaming in front of the children, she became fearful for herself and her children, calling 911 multiple times. Even when the children began crying, Day did not stop yelling, and at some point, Day approached M.D. and spit in her face. When Deputy Strait arrived at the residence, he witnessed Day cornering M.D. and pointing his finger in M.D.'s face. In addition, Deputy Strait could hear Day screaming from outside the house.

[19] Day's conduct was hostile and we conclude Day engaged in "fighting" within the meaning of Indiana's disorderly conduct statute.[3] *See J.S.*, 843 N.E.2d at 1016. To the extent Day argues the evidence is insufficient because his conduct occurred in his private residence, we are not persuaded the disorderly conduct statute is ambiguous, *see supra* Part I.B., and given the plain and ordinary meaning of the statute, Day himself concedes, "[I]t seems that a verbal altercation or hostility between family members in the privacy of their own home could satisfy the crime of disorderly conduct by fighting." Br. of Appellant at 6.

[20] Finally, we take this opportunity to respectfully address the dissent. The dissent describes the encounter between Day and M.D. as a "verbal argument," arguing the legislature did not intend for a "verbal argument" between members of a household, occurring within their own home, to be the sole basis of a criminal conviction for disorderly conduct. The dissent presents a good argument, and we agree the legislature did not intend to criminalize the act of engaging in a "verbal argument." However, we reemphasize it is the legislature who enacts a statute defining a crime, and when we are tasked with interpreting the statute on appeal, our primary goal is to determine and give effect to the legislature's intent. *See Adams*, 960 N.E.2d at 798. The best evidence of the legislature's intent is the statute's text, *id.*, and given the disorderly conduct statute's text and the definition of "fighting," the legislature intended to

---

[3] In fact, we note Day is fortunate not to have been charged with a more serious offense.

criminalize, without regard to the location, the act of engaging in a physically or verbally *hostile* encounter. Therefore, our decision does not suggest, contrary to the dissent's assertion, an individual can be convicted of disorderly conduct for engaging in a physical encounter or a verbal encounter. Rather, to be convicted of "fighting" under the Indiana disorderly conduct statute, an individual must engage in either a physically *hostile* encounter or a verbally *hostile* encounter. In addition, we note the dissent attempts to minimize Day's conduct by describing the encounter as a "verbal argument." This was much more than a verbal argument. We conclude the evidence is sufficient to prove Day committed disorderly conduct.

# Conclusion

[21] Indiana's disorderly conduct statute is not ambiguous, and given the plain and ordinary meaning of the statute's language, we conclude the evidence is sufficient to support Day's conviction. Accordingly, we affirm.

[22] Affirmed.

Altice, J., concurs.

Baker, J., dissents with opinion.

| | |
|---|---|
| Michael Day,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | Court of Appeals Case No.<br>24A05-1506-CR-724 |

**Baker, Judge, dissenting.**

[23] I respectfully dissent. I simply cannot believe that a verbal argument between members of a household, within their own home, can be the sole basis of a criminal conviction for disorderly conduct. Were this the case, spouses would have to fear arguing, parents would have to fear raising their voices at their children, and siblings would have to fear squabbling over toys. I cannot conclude that our legislature intended that two teenaged siblings arguing over what TV show to watch within their own home could be adjudicated delinquent. That cannot possibly be included in the definition of "fighting" or

"tumultuous conduct[.]"  I.C. § 35-45-1-3(a).  But under the majority opinion, which affirms a criminal conviction for a verbal argument between spouses within the confines of a residence, these basic human interactions would, indeed, be criminal.[4]

[24]    The majority emphasizes that a "verbally hostile encounter" is what the statute requires.  Initially, I note that the phrase "verbally hostile encounter" cannot be found in the statute.  Moreover, I have significant questions about the ability of anyone, including law enforcement, prosecutors, and citizens, to distinguish between a "verbal argument" and a "verbally hostile encounter."  Most people would readily admit that verbal arguments between spouses or between teenaged siblings are frequently laced with—or entirely comprised of—hostility.  I do not believe that the addition of hostility is a meaningful statutory distinction; nor does it cause me to conclude that such behavior can or should form the basis of a criminal conviction.

[25]    Finally, the majority opines that the interaction in this case was "much more than a verbal argument."  Slip op. p. 13.  I disagree.  Aside from the incident in which Day spat on his wife—which I have already stated could form the basis of a separate criminal charge and conviction—it was *entirely* a verbal argument.  Was it laced with hostility?  Perhaps.  But that does not change the fact that it

---

[4] There is some evidence in the record that Day spat on his wife.  This act constitutes a separate offense of class B misdemeanor battery by bodily waste.  Ind. Code § 35-42-2-1(b).  Had Day been charged and convicted of this offense rather than disorderly conduct, I would have no issue with the outcome.

was a verbal argument, and does not change my belief that these facts are insufficient to support a criminal conviction for disorderly conduct by fighting or tumultuous conduct. I disagree with this application of the disorderly conduct statute, and believe we should reverse Day's conviction.