Eric WHITTINGTON, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S02–9608–CR–534.

Supreme Court of Indiana.

Aug. 7, 1996.

Steven R. Jacobs, Indianapolis, for Appellant.

Pamela Carter, Attorney General of Indiana, Julie Zandstra Frazee, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

Appellant Eric Whittington was prosecuted for battery and disorderly conduct arising out of a domestic altercation. Although acquitted of battery, he was convicted of disorderly conduct, based on his loud speaking during the police investigation of the incident. He appeals that conviction. We affirm.

## I. Facts

The evidence at trial tended to show that Whittington had been drinking when he came home from work on March 12, 1993. He soon began to argue with his sister, who lived with him, and her boyfriend, who may also have lived in the apartment. At some point, Whittington either punched his pregnant sister in the abdomen or struck her while she and her boyfriend struggled to restrain him.

Apparently, someone in the apartment called the police. When Officer Anthony Finnell arrived, the boyfriend met him outside and escorted him into the apartment. Finnell noticed that furniture was strewn about the living room, and he found Whittington's sister in her bedroom holding her abdomen. After she told Finnell that Whittington had "hit" her, the officer summoned an ambulance.

Finnell then interviewed Whittington, the boyfriend, and another witness in the living room. When paramedics arrived, Finnell accompanied them into the bedroom. No sooner had he left the living room than a heated argument erupted between Whittington and the boyfriend. Finnell returned and sent the boyfriend to the bedroom in order to separate the two.

According to Finnell, Whittington continued to be "loud and boisterous," (R. at 65) repeatedly declaring, "This is all bullsh--" (R. at 66). When Finnell asked Whittington to sit and relax, Whittington responded, "F— this sh—." Finnell once again asked Whittington to be quiet and calm down because the outbursts were agitating the boyfriend, who could hear them from the bedroom. (R. at 66.) When Whittington persisted in "a very loud and angry manner," Finnell arrested him for disorderly conduct. (R. at 67.)

The State charged Whittington with the battery of his sister and with disorderly conduct, characterized in the information as "cursing, yelling, and acting in a belligerent manner." (R. at 7.) The court convicted Whittington of only disorderly conduct, based on Whittington's loud speaking during Finnell's investigation.

Whittington appealed, arguing that his speech was constitutionally protected. A divided Court of Appeals reversed, each judge writing an opinion. *Whittington v. State*, 634 N.E.2d 526 (Ind.Ct.App.1994). We grant transfer. Citing some of the same formulations raised in *Price v. State*, 622 N.E.2d 954 (Ind.1993), Whittington contends that his remarks were constitutionally protected.[1]

---

1. His brief styles the challenge under a categorical approach, *see Hess v. State*, 260 Ind. 427, 297 N.E.2d 413, *rev'd on other grounds*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), that we overruled in *Price*. Thus, his arguments focused on demonstrating that his remarks were not fighting words, obscenity, a public nuisance, or an incitement to lawlessness. (Br. at 16–18.) Whittington's brief does not expressly raise a distinct federal claim, but in *Price* we held that punishment of excessive volume under the disorderly conduct statute did not violate the First Amendment. 622 N.E.2d at 965–67.

## II. The Disorderly Conduct Statute

We shall begin by considering the application of the disorderly conduct statute in circumstances like those in this case. The context of Whittington's conduct is quite different than that we encountered in *Price*. There, the defendant's loud speaking occurred in an alley, and we observed that, where political expression was not at issue, the statute reached noise that amounted to a public nuisance. 622 N.E.2d at 966. In contrast, the loud speaking in this case occurred inside a private apartment, and there is no evidence that it was detectable beyond the walls of the apartment.

Indiana's disorderly conduct statute was adapted from a similar provision of the Model Penal Code. The proposed version read as follows:

> A person is guilty of disorderly conduct if, *with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof,* he ... makes unreasonable noise.... "Public" means affecting or likely to affect *persons in a place to which the public or a substantial group has access....*

Model Penal Code § 250.2(1)(b) (1980) (emphasis added). The drafters of the Model Code indicated that they intended this provision to penalize "public nuisance." *Id.* cmt. 2. That intent explains the inclusion of references to public inconvenience, annoyance, or alarm.

■ Although patterned on § 250.2, Indiana's disorderly conduct statute departs from the language of the Model Code in important respects. Our statute provides as follows:

> A person who recklessly, knowingly, or intentionally ... makes unreasonable noise and continues to do so after being asked to stop ... commits disorderly conduct, a Class B misdemeanor.

Ind.Code Ann. § 35–45–1–3(2) (West Supp. 1996). Significantly, our legislature deleted any reference to a requirement that a person act purposely or recklessly toward annoying the public. Instead, the mental element of Indiana's statute (intentional, knowing, or reckless) applies to the making of unreasonable noise, not to producing effects with the noise. Thus, the application of the statute can extend to situations in addition to those constituting public nuisance.

■ We held in *Price* that the criminalization of "unreasonable noise" was "aimed at preventing the harm which flows from the volume" of noise. 622 N.E.2d at 966. The State must prove that a defendant produced decibels of sound that were too *loud* for the circumstances. Whether the state thinks the sound conveys a good message, a bad message, or no message at all, the statute imposes the same standard: it prohibits context-inappropriate *volume*.

■ Loud noise could be found unreasonable in a case like Whittington's on a number of grounds. It could threaten the safety of injured parties by aggravating their trauma or by distracting the medical personnel tending them. Loud outbursts could agitate witnesses and disrupt police investigations. It could make coordination of investigations and medical treatment more difficult. Finally, loud noise can be quite annoying to others present at the scene.

## III. Whittington's Constitutional Claims

Reviewing the constitutionality of an application of the disorderly conduct statute requires a two-step inquiry. First, a reviewing court must determine whether state action has restricted a claimant's expressive activity. Second, if it has, the court must decide whether the restricted activity constituted an "abuse" of the right to speak.

### A. Restrictions on Expressive Activity

■ To challenge state action as violating the right to speak, a claimant must first demonstrate that the state action has, in the concrete circumstances of the case, restricted his or her opportunity to engage in expressive activity. This inquiry is governed by our Bill of Rights' free expression clause, which provides that "[n]o law shall be passed ... restricting the right to speak, write, or print, freely, on any subject whatever." Ind.

Const. art. 1, § 9.[2]

■ That clause contemplates a broad notion of expressive activity. First, it extends to "any subject whatever," and thus it is difficult to imagine a topic it does not cover.[3] Second, because the right to speak clause also provides that expressive activity may be "freely" performed, the clause reaches every conceivable mode of expression. We conclude that speaking, writing, or printing, freely, on any subject whatever, includes, at least, the projection of any words in any manner.

■ Of course, the trigger of the right to speak clause is the notion of restriction. In construing that important concept, we resist the siren song of First Amendment jurisprudence.[4] The right to speak clause articulates a liberty interest, not an equality interest. It protects against *restriction* of expressive activity, not *discrimination* because of content or viewpoint. The right to speak clause focuses on the restrictive impact of state action on an individual's expressive activity.[5] At a minimum, the clause is implicated when the state imposes a direct and significant burden on a person's opportunity to speak his or her mind, in whatever manner the speaker deems most appropriate.

### B. Abuse of the Right

■ The right to speak is qualified, of course, by § 9's responsibility clause, which provides that "for the abuse of that right, every person shall be responsible." Ind. Const. art. 1, § 9. The responsibility clause expressly recognizes the state's prerogative to punish expressive activity that constitutes an "abuse" of the right to speak.

■ In *Price,* we defined "abuse" in light of the political philosophy that informs the Indiana Constitution. 622 N.E.2d at 958–59; *see* Patrick Baude, *Has The Indiana Constitution Found Its Epic?,* 69 Ind.L.J. 849 (1994). Under that philosophy, individuals possess "inalienable" freedom to do as they will, but they have collectively delegated to government a quantum of that freedom in order to advance everyone's "peace, safety, and well-being." Ind. Const. art. 1, § 1; *see In re Lawrance,* 579 N.E.2d 32, 39 n. 3 (Ind.1991). The purpose of state power, then, is to foster an atmosphere in which individuals can fully enjoy that measure of freedom they have not delegated to government.

■ Applying this philosophy in *Price,* we construed "abuse" as any expressive activity that "injures the retained rights of individuals or undermines the State's efforts to facilitate their enjoyment." 622 N.E.2d at 959; *see also State v. Marshall,* 859 S.W.2d 289, 293–94 (Tenn.1993) (quoting 4 William Blackstone, Commentaries * 151–52; in defining "abuse" under Tennessee's

**2.** In full, § 9 provides,

> No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

Ind. Const. art. 1, § 9.

**3.** Consequently, we do not recognize a gerrymandering of the set of all expressive activities into those consisting of content that is constitutionally proscribable and those consisting of content that is not, *see R.A.V. v. City of St. Paul,* 505 U.S. 377, 383, 112 S.Ct. 2538, 2543, 120 L.Ed.2d 305 (1992) (calling obscenity, defamation, and "fighting words" "constitutionally proscribable content" under First Amendment). The phrase "constitutionally proscribable content" is incomprehensible within the discourse of § 9.

**4.** *See* Daniel O. Conkle, *The Indiana Supreme Court's Emerging Free Speech Doctrine,* 69 Ind.

L.J. 857, 857 (1994) (noting that *Price*'s "analytical framework ... differs dramatically from that which informs the First Amendment doctrine of the United States Supreme Court.").

**5.** The First Amendment also requires judicial scrutiny of some governmental actions that have the effect of burdening expression. *Compare United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) *with Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986); Laurence H. Tribe, American Constitutional Law § 12–23 (2d ed. 1988); *see also* Conkle, *supra,* at 858 & n. 12. In this respect, our approach to § 9 is somewhat analogous to the protection afforded religious practices under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb–1 (1994) ("Government shall not substantially burden a person's exercise of religion even if the burden results from a [neutral rule]," unless it demonstrates a compelling interest.).

parallel provision as any expression that legislature could reasonably find "destructive of the ends of society"). In other words, expressive activity constitutes "abuse" if, notwithstanding § 9, it is punishable within the strictures of the police power, as that power is generally delineated in the personal liberty clause, Ind. Const. art. 1, § 1.[6]

In *Price*, we made clear that in reviewing the state's determination that expression is an "abuse," we will "typically require only that [the conclusion] be rational." 622 N.E.2d at 959. It is true that the propriety of an exercise of the police power is a judicial question. *State v. Gerhardt*, 145 Ind. 439, 451, 44 N.E. 469 (1896). Nevertheless, we must accord "considerable deference" to the judgment of the legislature, inasmuch as the decision as to what constitutes a public purpose is first and foremost a legislative one. *Cf. Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994).

We have limited ourselves to the narrow role of determining whether challenged state action has some reasonable relation to [7] or tendency to promote [8] the state's legitimate interests. Thus, if a claimant demonstrates that the right to speak clause is implicated, he or she retains the burden of proving that the State could not reasonably conclude that the restricted expression was an "abuse."

### C. Political Expression

One way a claimant can try to meet this burden is to show that his or her expressive activity was political. If a claimant succeeds in that attempt, the State must demonstrate that its action has not materially burdened the claimant's opportunity to engage in political expression. *See Price*, 622 N.E.2d at 963–64.

This approach reflects our recognition that political expression is often beyond the scope of the delegated police power. In *Price* we reviewed the history of constitutional development in Indiana and concluded that implicit in the evolving protection for expression under the Indiana Bill of Rights is the idea that political expression is generally consistent with the goals of the police power. 622 N.E.2d at 961–63. Indeed, most political expression ultimately serves everyone's interests in peace, safety, and well-being. *See id.* at 962. Consequently, we held that pure [9] political expression cannot be said to consti-

---

**6.** This result is consistent with the overall structure of our Bill of Rights. The Indiana Constitution does not grant government an absolute, limitless state power and then withdraw discrete portions of it by specific excision. The individual guarantees in our Bill of Rights merely help to highlight some of the particular contours of the state power as it has generally been delegated. The particular guarantees of liberty in the Indiana Bill of Rights are but concrete manifestations of the abstract limiting principle that state power may only be exercised to advance the peace, safety, and well-being of Hoosiers. They merely describe with greater particularity some of the personal freedoms the restriction of which would not, in the framers' view, tend to advance those permissible state goals.

Dissenting in *Price*, Justice Dickson criticized the majority for failing to recognize the responsibility clause as "a separate and independent source of governmental authority to enact and enforce penal sanctions for abusive speech." 622 N.E.2d at 968–69. But while the Indiana Constitution does not grant unlimited legislative power, neither does it establish a system of expressly enumerated powers. We never probe the terms of the constitution for a "source of governmental authority," because power is *generally* vested in the legislature, *See* Ind. Const. art. 4, § 1, and the outer boundary of that general power is marked by the requirement that it be exercised to advance "peace, safety, and well-being," Ind. Const. art. 1, § 1. Far from a "source" of legislative authority, the responsibility clause simply ensures that, despite the presence of the right to speak clause, the state retains its delegated authority to promote the peace, safety, and well-being of Hoosiers by punishing expression that could be thought to undermine those ends.

**7.** *E.g., Hanley v. State*, 234 Ind. 326, 334, 123 N.E.2d 452, 455 (1954).

**8.** *E.g., Department of Financial Institutions v. Holt*, 231 Ind. 293, 302, 108 N.E.2d 629, 634 (1952).

**9.** Our use of the adjective "pure," instead of the adverb "purely," is no grammatical oversight; we intend "pure" to modify "expression," not "political." As we indicated in *Price*, the approach under § 9 might be different were the challenger's activity not pure expression—that is, were it mixed with non-expressive conduct. 622 N.E.2d at 963 n. 14. What we have not said—and do not decide here—is that the content of the expression must be "purely political," *Radford v. State*, 640 N.E.2d 90, 93 (Ind.Ct.App.1994).

tute an "abuse" within the police power unless it "inflicts upon determinable parties harm of a gravity analogous to that required under tort law." *Id.* at 964.[10]

■■■■ Our opinion in *Price* reveals that the common feature of political expression is reference to state action. For example, we referred to expressive activity that is "occasioned by the conduct of government actors and regards a matter of public concern." *Id.* at 961. Expressive activity is political, for the purposes of the responsibility clause, if its point is to comment on government action, whether applauding an old policy or proposing a new one, or opposing a candidate for office or criticizing the conduct of an official acting under color of law.[11] The judicial quest is for some express or clearly implied reference to governmental action.

■■■ In contrast, where an individual's expression focuses on the conduct of a private party—including the speaker himself or herself—it is not political. In *Price,* the State conceded that Colleen Price was protesting police treatment of another citizen before an officer warned her to be quiet. 622 N.E.2d at 956–57. After the warning, her expression did shift to a defense of her own conduct, *id.* at 957, but a conviction for disorderly conduct requires proof of "unreasonable noise" both before and after an official warning. *See* Ind.Code Ann. § 35–45–1–3(2) (West Supp.1996). It was the State's reliance on Price's pre-warning political expression to prove an essential element of the offense that was fatal to the conviction.

■■■■ A court need not engage in speculation as to what a speaker might have meant. We will judge the nature of expression by an objective standard, and the burden of proof is on the claimant to demonstrate that his or her expression would have been understood as political. If the expres-

sion, viewed in context, is ambiguous, a reviewing court should find that the claimant has not established that it was political and should evaluate the constitutionality of any state-imposed restriction of the expression under standard rationality review. *See Price,* 622 N.E.2d at 959–60.

If, however, a claimant succeeds in demonstrating that his or her expression was political, we may assume that the expression did not undermine peace, safety, and well-being. To sustain the challenged state action, the State must demonstrate that its action did not materially burden the claimant's political expression. Our opinion in *Price* suggests that state action does not impose a material burden on expression if either the "magnitude of the impairment" is slight, 622 N.E.2d at 960 n. 7, or the expression threatens to inflict "particularized harm" analogous to tortious injury on readily identifiable private interests, *id.* at 964.

### D. *Whittington's Conviction*

Whittington has established that the state restricted his expressive activity. He was convicted of making "unreasonable noise" based solely on his loud speaking during Finnell's investigation of the reported domestic dispute.

■■■ Whittington has failed to demonstrate, however, that his expressive activity did not constitute an "abuse" of the right to speak. We have little difficulty concluding that his expression was not political. Whittington testified that his remarks were not directed toward Officer Finnell. (R. at 82.) Whittington was irritated that the police were investigating the domestic complaint (R. at 84, 66), but he appears to have directed his frustration toward his sister's boyfriend, who may have been the one who

---

10. We have no occasion here to consider whether an injury to government's ability to carry out some or all of its legitimate proprietary, administrative, or policymaking functions constitutes a harm "analogous" to tortious injury. *See* Conkle, *supra,* at 863.

11. *See* Conkle, *supra,* at 861 (noting that political expression could be defined as speech that "explicitly addresses governmental action").

The flat assertion by the Court of Appeals that purely political expression "does not include speech directed at a police officer who is attempting to perform his duties or enforce a statute," *Radford,* 640 N.E.2d at 94, is inconsistent with the repeated emphasis in *Price* that political expression focuses on the conduct of government officials and agents.

summoned the police. He also protested that he had not done anything and that the other witnesses were lying. (R. at 66.) These statements involve the conduct of private individuals, not state action. In the final analysis, the evidence does not support an assertion that Whittington's expression was political.

■ Thus, we must apply rationality review in determining whether the state could reasonably have concluded that Whittington's expressive activity, because of its volume, was an "abuse" of the right to speak or was, in other words, a threat to peace, safety, and well-being. We easily conclude that Whittington has not negated "every conceivable basis" for the state action in his case. *Collins,* 644 N.E.2d at 80.

In *Price* we abstractly observed that "abating excessive noise is an objective our legislature may legitimately pursue." 622 N.E.2d at 960. On the facts of this case, it is reasonably conceivable that the loud outbursts in the concrete circumstances of this case could have agitated other persons in the apartment, sparked additional disruptions of Finnell's investigation, or interfered with his ability to manage the medical crew and the alleged crime scene. The noisy tirade could have threatened the safety of Whittington's sister by aggravating her trauma or by distracting the medical personnel tending her injury. Finally, the volume of the speech undoubtedly made it highly annoying to all present. The state could therefore have believed Whittington's outbursts constituted an "abuse" of the right to speak and, as such, fell within the purview of the police power.

We hold that Whittington's conviction for disorderly conduct did not contravene the right to speak, as guaranteed by Section 9 of the Indiana Bill of Rights.

### IV. Conclusion

We affirm the judgment of the trial court.

DeBRULER and SELBY, JJ., concur.

SULLIVAN, J., concurs in result with separate opinion.

DICKSON, J., dissents and concurs in result with separate opinion.

SULLIVAN, Justice, concurring in result.

I share some, but not all, of Justice Dickson's concerns with the analysis of Article I, § 9, of the Indiana Constitution contained in *Price v. State,* 622 N.E.2d 954 (Ind.1993). In particular, I find troubling *Price's* implication that, while protection for political speech is "enshrine[d]" in Article I, § 9, other types of speech—religious, literary, scientific, artistic, for example—must apparently look elsewhere in the Indiana Bill of Rights for protection. This does not seem to square with the fact that Article I, § 9, covers "the right to speak, write, or print, freely, on any subject whatever."

At the same time, I agree with both the majority and Justice Dickson that Mr. Whittington's rights under Article I, § 9, were not implicated by his prosecution for disorderly conduct here and so concur in result, leaving the development of the protections afforded speech under the Indiana Constitution to future cases.

DICKSON, Justice, dissenting and concurring in result.

Because the majority bases its decision upon the controversial case of *Price v. State,* 622 N.E.2d 954 (Ind.1993), I dissent. This Court decided *Price* in a 3–2 opinion, and the denial of the rehearing petition by a 2–1 vote did not disclose the views of the two abstaining Justices who have joined this Court since the issuance of the original opinion[1]. I continue to believe that *Price* is an incorrect and harmful interpretation of Article I, Section 9 of the Indiana Constitution.

In today's decision, the majority perpetuates various aspects of *Price* that I contend are particularly mistaken. *Price* unnecessarily propounds, and superimposes upon the clear language of Section 9, its theory of "core constitutional values"—a concept that,

---

1. Furthermore, we do not know whether today's majority opinion reflects the views of Justice Boehm, who will be sworn in later today to replace the retiring Justice DeBruler, a member of the *Price* majority.

by affording preferential treatment to political but not other speech, defies the express declaration in Section 9 that the right to speak, write, or print extends to "any subject whatever." Ind. Const. art. I, § 9. Likewise, I believe that the *Price* majority was mistaken to predicate its analysis upon a redefinition of the simple word "abuse" as "the use of a thing in a manner injurious to the order or arrangement from which it derives its function." *Price,* 622 N.E.2d at 958.

Defendant Whittington was convicted of disorderly conduct. His appeal contends that his words and actions were "protected speech." The unwieldy nature of *Price* is evident from the fact that the Court of Appeals, in an earnest attempt to apply *Price,* reversed this conviction that the majority, also applying *Price,* today affirms. *See Whittington v. State,* 634 N.E.2d 526 (Ind.Ct. App.1994). The questionable utility of *Price* is also demonstrated by the difficulties the Court of Appeals has encountered in applying its formulation in other decisions. In *Hooks v. State,* 660 N.E.2d 1076 (Ind.Ct.App. 1996), a divided court affirmed the conviction over a strong dissent from Judge Robertson. The *Price* philosophy led the Court of Appeals in *Radford v. State,* 627 N.E.2d 1331 (Ind.Ct.App.1994), to overturn a conviction initially; then, on rehearing and after a change of personnel, the court reversed itself and affirmed the conviction. *See Radford v. State,* 640 N.E.2d 90 (Ind.Ct.App.1994). The *Price* framework does not facilitate the development of consistent, principled decisions.

Without resorting to the *Price* methodology, I would affirm Whittington's conviction in the present case because it does not violate the plain and ordinary meaning of Article I, Section 9. The disorderly conduct statute, which is directed against the manner of expression and not its content, does not restrain or restrict "the right to speak, write, or print, freely, on any subject whatever." Regardless of the presence or absence of political content, Whittington's words are entitled to free speech protection.[2] However,

because Section 9 insists that every person "shall be responsible for the abuse of that right," Whittington may be held criminally accountable. I would find the rights of free expression to have been abused when exercised contrary to laws prescribing reasonable time, place, and manner limitations. Indiana's disorderly conduct statute fairly establishes such parameters.

---

**2.** I would find the free expression rights recognized by Section 9 to prevail against state action based upon *ordinary* police power and would permit restriction of the rights only upon the reasonable exercise of those police powers that

are actually *necessary* to safeguard the peace, safety, and well-being of the general public. *See Clem v. Christole,* 582 N.E.2d 780, 784 (Ind. 1991).