FILED

Feb 13 2018, 7:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Victoria L. Bailey
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Shawn McBride,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | February 13, 2018<br><br>Court of Appeals Case No.<br>11A01-1706-CR-1236<br><br>Appeal from the Clay Circuit<br>Court<br><br>The Honorable Joseph D. Trout,<br>Judge<br><br>Trial Court Cause No.<br>11C01-1608-CM-671 |

**Brown, Judge.**

[1] Shawn McBride appeals his conviction for criminal trespass as a class A misdemeanor. We affirm.

## *Facts and Procedural History*

[2] On August 12, 2016, Chief Deputy Prosecutor Emily Clarke was working in the Prosecutor's office and overheard McBride state that he wanted old tickets to be dismissed, staff explain to him the process, and McBride become rude. Chief Deputy Prosecutor Clarke and others explained the process for setting aside judgments. McBride "really didn't want to listen" and said, "No, you're gonna dismiss my ticket." Transcript Volume II at 135. He also stated, "Nope. You're gonna dismiss my ticket and I'm not leaving until you do." *Id.* Chief Deputy Prosecutor Clarke told McBride that that was not something they could do, that he would have to deal with the court and file something, and that he needed to leave if he had no other business with their office.

[3] At some point, McBride asked to speak with a prosecutor, and Chief Deputy Prosecutor Clarke said, "I am the Chief Deputy Prosecutor. I'm the only prosecutor in the court . . . or in the office today. And I am the one that handles that court with these tickets and I am telling you that I will not dismiss them and that you need to file something with the court." *Id.* at 136. McBride said, "No, you're gonna dismiss my tickets." *Id.* Chief Deputy Prosecutor Clarke told McBride to leave because he was a disruption to the office and had disrupted the entire office "to where everyone in the office was now paying attention to him and watching the standoff." *Id.* at 137. Chief Deputy

Prosecutor Clarke called dispatch and advised that she had someone who was refusing to leave, and several officers came to the office and escorted McBride.

[4] On August 16, 2016, McBride filed a Pro Se Petition for Waiver of Fees and Fines and Request for Hearing/Dismissal of Charges in which he asserted that his inability to pay had left his license as indefinitely suspended. That same day, Clay County Sheriff's Special Deputy Don Workman, who had been appointed to the courthouse for security, observed McBride sitting on a bench looking at papers in the Superior Court Office. Deputy Workman decided to talk to McBride because he was aware of the prior incident in the courthouse a week earlier in which McBride was escorted out of the Prosecutor's office. Deputy Workman asked McBride if he was Shawn McBride, and McBride acknowledged that he was. Deputy Workman asked, "Would you not cause a disturbance like you did the week before?" *Id.* at 122. McBride jumped up from a sitting position and said he would "talk to any f------ body he wants and . . . go in any f------ place he wants." *Id.* Deputy Workman told McBride not to go to the Prosecutor's office and that he could be arrested.

[5] Deputy Workman then contacted Clay County Sheriff's Chief Deputy Josh Clarke. Later, Deputy Workman was standing inside the Prosecutor's office on the visitor side of the counter when McBride's friend came in and asked Deputy Workman to step out and talk to McBride. Deputy Workman went to speak to McBride, and McBride indicated that he wanted to turn in papers to the Prosecutor's office. Deputy Workman told Chief Deputy Prosecutor Clarke that McBride had paperwork for her, and she replied: "He can come in and he

can place it on the counter and he can leave." *Id.* at 141. Deputy Workman then told McBride that he could go in, place the papers on the counter, and walk out.

[6] McBride entered the Prosecutor's office, someone instructed him to put the papers on the counter, and McBride "[k]inda went off on them," and immediately went into the "same narrative of, 'You're gonna dismiss my ticket,'" "[k]inda screaming and hollering, demanding" in a loud fashion. *Id.* at 125, 141. Chief Deputy Prosecutor Clarke told McBride to leave several times. She instructed him that he could place whatever paperwork he had on the counter and that he then needed to leave. McBride said, "No. I'm not leaving until you dismiss my ticket." *Id.* at 142. Chief Deputy Prosecutor Clark said: "We're not doing this today and you need to leave if you have no further business." *Id.* McBride told her several times: "No. You're dismissing my ticket." *Id.* Chief Deputy Prosecutor Clark said: "I've given you a trespass warning before. You are trespassing. You need to leave. You can be arrested." *Id.* Chief Deputy Prosecutor Clarke asked or told him to leave at least fifteen times. McBride insisted he had a right to be there, that it was a public office and building, that he did not have to leave, and demanded that she talk to him. Deputy Workman stepped next to McBride and told him that he had overstepped his boundaries. Chief Deputy Sheriff Clarke stepped out from an office and repeated: "You need to leave. You need to calm down." *Id.* at 126. McBride did not leave. Sheriff Clarke gave him a couple more commands

and said he was going to arrest him, and McBride said "Arrest me then." *Id.* Sheriff Clarke arrested McBride and escorted him out of the Prosecutor's office.

[7] On August 30, 2016, the State charged McBride with two counts of criminal trespass as class A misdemeanors.[1] On May 1, 2017, the court held a jury trial. Robert Pell, the Prosecuting Attorney of Clay County, testified that he told Emily Clarke that she had authority to kick someone out of the Prosecutor's office. With respect to the August 12, 2016 incident, Chief Deputy Prosecutor Clarke testified:

> I told him if he didn't have anything else, he needed to leave and our office needed to conduct our daily tasks which include a lot of confidential things, you know, we deal with juvenile records, we deal with victims that their stuff is not accessible to the public, and our staff is in one big room where the public also enters so it's not plausible for someone to just post up in our office and watch the daily activities all day long.

*Id.* at 137. When asked why she asked McBride to leave on August 16, 2016, Chief Deputy Prosecutor Clarke answered:

> Because the same thing. He was just trying to disrupt our office. There was no legitimate business he had with our office. He was just demanding me to dismiss tickets and he had already caused disruption one day and I didn't want him to cause further disruption in our office.

---

[1] The State also charged McBride with resisting law enforcement as a class A misdemeanor and later with two counts of disorderly conduct as class B misdemeanors, but these charges were later dismissed.

*Id.* at 143.

[8] After the State rested, McBride's counsel moved for a verdict on the evidence, and the court denied the motion. McBride then called several witnesses from the Prosecutor's office. Roxanna Tisdale, the office manager of the Prosecutor's office, testified that she was present on both days McBride entered the office, that she was sure Chief Deputy Prosecutor Clarke "probably told him he needed to discuss this with an attorney as we all did," and that McBride said "we were just supposed to take care of this for him and he wasn't leaving until we did." *Id.* at 172-173. She testified McBride came in on the 16th and stated he was not leaving, "was not taking no for an answer," and "was not leaving until we took care of it for him." *Id.* at 175. On cross-examination, she testified that McBride was disrupting the office and "[w]e weren't able to work because of it." *Id.* at 178.

[9] Allison Butts, an administrative assistant in the Prosecutor's office, testified that McBride insisted he had a right to be there and that it was a public office. She also testified that McBride was "loud and angry" and she believed he was threatening on the 12th and that McBride was "loud and irritated with his voice" on the 16th. *Id.* at 184. On cross-examination, she testified that it was difficult to do her work on the 12th and 16th because McBride "kept coming in and bothering us with the same . . . with the same questions." *Id.* at 187.

[10] Stephanie Dickison, a victim advocate at the Prosecutor's office, testified that McBride returned on the 16th, was told to place the documents on the counter

and leave, and he "started basically asking and saying the same things that he did on the first day." *Id.* at 192. She testified that he was very demanding and very persistent both days and that he said it was a public building and he did not have to leave.

[11] Lea Maynard, the Prosecutor's assistant, testified that McBride was not threatening but refused to leave. On cross-examination, she testified that McBride's behavior made her nervous and she was unable to concentrate on her work. Keli McCoy, a victim advocate in the Prosecutor's office, testified that McBride was told to come in and drop the papers off and leave but he stayed and kept talking.

[12] McBride testified that he called the Prosecutor's office the week before August 12th and that "the traffic tickets were indefinite against my license which means I never appeared in front of them and they're from 2004." *Id.* at 207. He testified: "My license . . . my driving record was crazy. I had tons of tickets from whenever I was younger and I was finally getting everything paid off and taken care of." *Id.* He testified that he "[c]ouldn't get anywhere on the phone," went in, and "just kept repeating, 'I need to speak to somebody about these tickets.'" *Id.* at 207-208. According to McBride, he was finally told he had to file something, he returned on the 16th after filing a petition, and the Prosecutor's office absolutely refused to speak to him both times. He stated:

> [I]f she would've told me that the . . . there's been judgments made against it, which I didn't understand because it was still indefinite against my license, still holding me up from receiving

> my license, like I said, I would've filed it as a civil matter and addressed it that way. So this did me absolutely no good filing it like this. I did get them paid off though.

*Id.* at 209-210. McBride testified that they kept telling him to leave, that he refused, and that he stated, "Arrest me then cause this is public space." *Id.* at 211. On cross-examination, McBride testified that Chief Deputy Prosecutor Clarke told him that he had to file something, that it was explained to him on August 12th that he needed to file something, and that he subsequently filed a petition.

[13] The jury found McBride guilty of Count II, criminal trespass as a class A misdemeanor which related to August 16, 2016, and not guilty of Count I, criminal trespass as a class A misdemeanor relating to August 12, 2016. The court sentenced McBride to the Clay County Justice Center for a period of 365 days, all suspended but for forty days, and placed him on probation for 325 days.

## Discussion

[14] McBride concedes that he finds no authority considering a challenge to a criminal trespass conviction on Article 1, Section 9 grounds as set out in *Price v. State*, 622 N.E.2d 954 (Ind. 1993), *reh'g denied*. He asserts that his conviction must be vacated because the State action restricted his expressive activity and his expressive activity did not constitute an abuse of his right to speak. He contends that the State restricted his opportunity to engage in expressive activity in the manner he deemed most appropriate, that his speech was

political, and that the State imposed a material burden on his opportunity to engage in political expression.

[15] The State argues that McBride's constitutional claims are waived because he did not bring the challenge through a pretrial motion as provided by Ind. Code § 35-34-1-4.[2] The State acknowledges that courts have occasionally overlooked this procedural bar and addressed constitutional arguments, but asserts that such a position is supportable in prosecutions where speech or expression is an element of the crime, and speech, publication, or association are not elements of the trespassing statute. The State argues that McBride's challenges do not involve the elements of his offense and cannot be imported into a sufficiency analysis. It contends that McBride's arguments do not frame a challenge to the statute as applied and asserts that McBride's focus on constitutional protection for his uncharged conduct asks this Court "to entertain a newly-broadened range of as-applied challenges, which includes challenges by defendants who engage in 'expressive activity' while stalking, exceed the speed limit while taking their children to school, or refuse orders to leave property because they

---

[2] Ind. Code § 35-34-1-4(a) provides in part that "[t]he court may, upon motion of the defendant, dismiss the indictment or information upon any of the following grounds: . . . (5) The facts stated do not constitute an offense. . . . (11) Any other ground that is a basis for dismissal as a matter of law." Ind. Code § 35-34-1-4(b) provides in part that the motion shall be made no later than ten days prior to the omnibus date if the defendant is charged only with one or more misdemeanors. Ind. Code § 35-34-1-4(c) provides that "a defendant who is in a position adequately to raise more than one (1) ground in support thereof shall raise every ground upon which he intends to challenge the indictment or information" and that "the court, in the interest of justice and for good cause shown, may entertain and dispose" of a subsequent motion "on the merits."

have the right to carry a gun." Appellee's Brief at 16. The State also asserts that, assuming McBride preserved and framed an as-applied challenge, his trespassing conviction does not violate Article 1, Section 9. It contends that McBride's demands were sheer bullying, not political speech, and that, even assuming McBride's speech was political, it was not materially burdened because his speech created a harm to specific interests in the business of the Prosecutor's office that rose above the level of a fleeting annoyance.

[16] With respect to the State's argument that McBride waived this issue, we acknowledge that this Court and the Indiana Supreme Court "have previously held on several occasions that failure to file a proper motion to dismiss raising a constitutional challenge to a criminal statute waives the issue on appeal." *Allen v. State*, 798 N.E.2d 490, 502 (Ind. Ct. App. 2003) (citing *Smith v. State*, 727 N.E.2d 763, 766 (Ind. Ct. App. 2000); *Payne v. State*, 484 N.E.2d 16, 18 (Ind. 1985); *Wiggins v. State*, 727 N.E.2d 1, 5 (Ind. Ct. App. 2000), *trans. denied*; *Vaillancourt v. State*, 695 N.E.2d 606, 610 (Ind. Ct. App. 1998), *trans. denied*; *Reed v. State*, 720 N.E.2d 431, 433 (Ind. Ct. App. 1999), *trans. denied*). However, both Courts have also considered constitutional challenges even when the defendant has failed to file such a motion. *See Burke v. State*, 943 N.E.2d 870, 872 (Ind. Ct. App. 2011) (citing *Morse v. State*, 593 N.E.2d 194, 197 (Ind. 1992) (stating that "the constitutionality of a statute may be raised at any stage of the proceeding including raising the issue *sua sponte* by this Court" and therefore addressing a constitutional challenge to a statute raised for the first time in defendant's *pro se* motion filed on appeal even though defendant's counsel did

not raise the issue in an appellate brief), *reh'g denied*; *Payne*, 484 N.E.2d at 18 (acknowledging doctrine of waiver but considering unpreserved constitutional challenge where State did not raise waiver issue); *Price v. State*, 911 N.E.2d 716, 719 (Ind. Ct. App. 2009) (addressing a constitutional challenge to a criminal statute even though defendant failed to file a motion to dismiss and State argued waiver), *trans. denied*; *Vaughn v. State*, 782 N.E.2d 417, 420 (Ind. Ct. App. 2003), *trans. denied*), *trans. denied*; *see also Plank v. Cmty. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 53-54 (Ind. 2013) ("Essentially, *Morse* stands for the proposition that appellate courts are not prohibited from considering the constitutionality of a statute even though the issue otherwise has been waived.  And indeed a reviewing court may exercise its discretion to review a constitutional claim on its own accord.").

[17]   Even considering the merits of McBride's arguments, we cannot say that reversal is warranted.  The relevant portion of the statute governing criminal trespass, Ind. Code § 35-43-2-2, provides that "[a] person who . . . not having a contractual interest in the property, knowingly or intentionally refuses to leave the real property of another person after having been asked to leave by the other person or that person's agent . . . commits criminal trespass, a Class A misdemeanor."  Speech is not an element of the crime of criminal trespass and, to that extent, is unlike the circumstances in *Price* in which the Court addressed "Price's Noise," *Price*, 622 N.E.2d at 964, and a statute prohibiting the making of unreasonable noise and continuing to do so after being asked to stop.  *See Whittington v. State*, 669 N.E.2d 1363, 1370 n.9 (Ind. 1996) (noting that "[a]s we

indicated in *Price*, the approach under § 9 might be different were the challenger's activity not pure expression—that is, were it mixed with non-expressive conduct"). To the extent McBride's conviction could be challenged under Article 1, Section 9, we cannot say that reversal is warranted.

[18] Article 1, Section 9 of the Indiana Constitution prohibits the legislature from passing laws "restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever." It further states that "for the abuse of that right, every person shall be responsible." Ind. Const. art. 1, § 9. "This clause embodies a 'freedom-and-responsibility standard,' which prohibits the legislature from impairing the flow of ideas but allows it to sanction individuals who commit abuse." *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 804-805 (Ind. 2011) (quoting *Price*, 622 N.E.2d at 958), *reh'g denied*, *cert. denied*, 568 U.S. 825, 133 S. Ct. 218 (2012)). "Claims that a statute violates the free speech clause of the Indiana Constitution are evaluated under a different standard than claims based on the First Amendment of the U.S. Constitution." *Id.* at 805.

[19] Reviewing the constitutionality of an application of a statute generally requires a two-step inquiry. *See Whittington*, 669 N.E.2d at 1367. First, a reviewing court must determine whether state action has restricted a claimant's expressive activity. *Id.* Second, if it has, the court must decide whether the restricted activity constituted an "abuse" of the right to speak. *Id.* "[I]n reviewing the state's determination that expression is an 'abuse,' we will 'typically require only that [the conclusion] be rational.'" *Id.* at 1369 (quoting *Price*, 622 N.E.2d

at 959). "[I]f a claimant demonstrates that the right to speak clause is implicated, he or she retains the burden of proving that the State could not reasonably conclude that the restricted expression was an 'abuse.'" *Id.*

[20] "One way a claimant can try to meet this burden is to show that his or her expressive activity was political." *Id.* "If a claimant succeeds in that attempt, the State must demonstrate that its action has not materially burdened the claimant's opportunity to engage in political expression." *Id. See also Econ. Freedom Fund*, 959 N.E.2d at 805 ("For Article 1, Section 9 claims, if a statute affects political speech, which is an established core constitutional value, we engage in 'material burden' analysis.").

[21] Expressive activity is political, for the purposes of the responsibility clause, if its point is to comment on government action, whether applauding an old policy or proposing a new one, or opposing a candidate for office or criticizing the conduct of an official acting under color of law. *Whittington*, 669 N.E.2d at 1370. "In contrast, where an individual's expression focuses on the conduct of a private party—including the speaker himself or herself—it is not political." *Id.* We will judge the nature of expression by an objective standard, and the burden of proof is on the claimant to demonstrate that his or her expression would have been understood as political. *Id.* If the expression, viewed in context, is ambiguous, a reviewing court should find that the claimant has not established that it was political and should evaluate the constitutionality of any state-imposed restriction of the expression under standard rationality review. *Id.*

[22] The record reveals that McBride's arrest restricted his expressive activity within the Prosecutor's office. When asked by Deputy Workman on August 16th not to cause a disturbance like he did the previous week, McBride said he would "talk to any f------ body he wants and . . . go in any f------ place he wants." Transcript Volume II at 122. McBride entered the Prosecutor's office and told them "You're gonna dismiss my ticket," "[k]inda screaming and hollering, demanding" in a loud fashion. *Id.* at 125, 141. He told Chief Deputy Prosecutor Clarke that he was not leaving until she dismissed his ticket. Tisdale, the office manager, testified that McBride stated that he "was not leaving until we took care of it for him." *Id.* at 175. Dickison, the victim advocate at the Prosecutor's office, testified that McBride said it was a public building and he did not have to leave. McBride testified:

> Yes, they kept telling me to leave. Yes, I refused. Like I said, it's a public office. You work for the public. I am the public. I need this taken care of. They told me they were gonna arrest me. I said, "Arrest me then cause this is public space."

*Id.* at 211. Based on the record, we conclude that McBride's statements viewed in context were at least in part a comment on his own behavior and ambiguous as to whether his speech was political in nature. *See Anderson v. State*, 881 N.E.2d 86, 90 (Ind. Ct. App. 2008) (holding that because the police were "only" doing what the company who called the police wanted done, removing the defendant from the premises, the defendant's comments were "[i]n essence . . . about the company's decision to make him leave and not so much about the officers' conduct and thus was asserting a right to be where he was, which is a

comment on his own behavior"); *Blackman v. State*, 868 N.E.2d 579, 586 (Ind. Ct. App. 2007) (holding that defendant's comments were of a "dual nature" and thus ambiguous because the "comment that 'she had every right to be there, that she did not have to leave the scene,' constituted expression focused on the conduct of a private party"), *trans. denied*. Accordingly, we apply rationality review in determining whether the State could reasonably have concluded that McBride's expressive activity was an abuse of the right to speak or was, in other words, a threat to peace, safety, and well-being. *See Whittington*, 669 N.E.2d at 1371 (holding that the evidence did not support an assertion that Whittington's expression was political and holding that "we must apply rationality review in determining whether the state could reasonably have concluded that Whittington's expressive activity, because of its volume, was an 'abuse' of the right to speak or was, in other words, a threat to peace, safety, and well-being").

[23]     "Rationality inquiry under § 9 has historically centered on whether the impingement created by the statute is outweighed by the public health, welfare, and safety served." *Price*, 622 N.E.2d at 960 n.7. The evidence reveals that McBride's trespass occurred in the Prosecutor's office. Chief Deputy Prosecutor Clarke testified that she told McBride on August 12th that he needed to leave if he did not have anything else and that

> our office needed to conduct our daily tasks which include a lot
> of confidential things, you know, we deal with juvenile records,
> we deal with victims that their stuff is not accessible to the public,
> and our staff is in one big room where the public also enters so
> it's not plausible for someone to just post up in our office and
> watch the daily activities all day long.

Transcript Volume II at 137. When asked why she asked McBride to leave on August 16, 2016, Chief Deputy Prosecutor Clarke answered:

> Because the same thing. He was just trying to disrupt our office. There was no legitimate business he had with our office. He was just demanding me to dismiss tickets and he had already caused disruption one day and I didn't want him to cause further disruption in our office.

*Id.* at 143. Tisdale testified that McBride was disrupting the office and "[w]e weren't able to work because of it." *Id.* at 178. Butts, an administrative assistant, testified that it was difficult to do her work on the 16th. Under the circumstances, we conclude that the State could have reasonably determined that McBride's conduct constituted an abuse of his right to speak. Accordingly, McBride's conviction for trespass did not violate Article 1, Section 9 of the Indiana Constitution.

### *Conclusion*

[24] For the foregoing reasons, we affirm McBride's conviction.

[25] Affirmed.

Baker, J., and Riley, J., concur.