## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 11 2019, 9:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachary J. Stock
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James Murphy, *Appellant-Defendant,* | December 11, 2019 |
| v. | Court of Appeals Case No. 19A-CR-1289 |
| | Appeal from the Hendricks Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Stephenie LeMay-Luken, Judge |
| | Trial Court Cause No. 32D05-1811-CM-1664 & 32D05-1811-CM-1668 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, James Murphy (Murphy), appeals his convictions for intimidation, a Class A misdemeanor, Ind. Code § 35-45-2-1(a)(1); resisting law enforcement, a Class A misdemeanor, I.C. § 35-44.1-3(a)(1); and disorderly conduct, a Class B misdemeanor, I.C. § 35-45-1-3(a)(2).

We affirm in part, and reverse in part.

# ISSUE

Murphy presents this court with one issue on appeal, which we restate as: Whether the State presented sufficient evidence beyond a reasonable doubt to support his convictions.

# FACTS AND PROCEDURAL HISTORY

On August 20, 2018, United States Postal Service (USPS) mail carrier Kiesha Fassett (Fassett) was delivering mail on Gibbs Street in Plainfield, Indiana. Murphy drove toward Fassett, parked his truck, and exited. Murphy approached Fassett and accused her of "withholding his check." (Transcript Vol. II, p. 13). When Fassett stated that she did not have Murphy's check, Murphy threatened Fassett that if she "didn't deliver his check," he was going to hurt her. (Tr. Vol. II, p. 15). Scared by Murphy's actions, Fassett warned Murphy to "back up" or that she would use her "dog spray" on him. (Tr. Vol. II, p. 16). Fassett called the police as well as her "postal supervisors due to her fear of returning" on that route to deliver mail. (Appellant's App. Vol. II, p. 14). Murphy drove off before the police arrived.

On August 24, 2018, Officer Cole Wuest (Officer Wuest) of the Plainfield Police Department went to Murphy's home. Upon arrival, Officer Wuest knocked on the door and initiated contact with Murphy. Officer Wuest advised Murphy that he was there to follow up on the incident between Murphy and Fassett. Murphy admitted that he "did get angry" during his encounter with Fassett, and he claimed that he was upset with Fassett since she was supposed to be delivering his $1,000 "tax check." (Appellant's App. Vol. II, p. 15).

On September 4, 2018, under Cause Number 32D05-1811-CM-1664 (Cause No. 1164), the State filed an Information, charging Murphy with intimidation, a Class A misdemeanor. Also, a no-contact order was issued against Murphy. On October 2, 2018, the State issued a warrant for Murphy's arrest because he failed to appear for his initial hearing.

On October 3, 2018, in the company of other officers, Officer Joshua Jellison (Officer Jellison), arrived at Murphy's home to arrest Murphy. Murphy's mother answered the door and Officer Jellison informed her that he was there to speak with Murphy. When Murphy came to the door, Officer Jellison informed Murphy that he had a warrant for his arrest. Officer Jellison asked Murphy "approximately two (2) to three (3) times to step out of the house." (Tr. Vol. II, p. 43). Murphy refused to exit his house and at that point, Officer Jellison put his "right hand on the cusp of [Murphy's] right elbow, and [his] left hand on [Murphy's] wrist" so that he "could gain control and place [Murphy] in cuffs." (Tr. Vol. II, p. 43). Officer Jellison then attempted to pull Murphy out of the house, but Murphy pulled away multiple times. With the help of

another officer, Officer Jellison forcefully removed Murphy from the house. During his arrest, Murphy repeatedly yelled at the officers that he "didn't need to come with [the officers]," the warrant was not "good", and he had "been pardoned for his crimes." (Tr. Vol. II, p. 49). Also "screaming at the top of his lungs," Murphy yelled that he had been "pardoned by Donald Trump" and "he wasn't responsible for whatever the original charge was on the warrant." (Tr. Vol. II, pp. 44, 51).

[8] Despite numerous warnings, Murphy did not cease screaming. Eventually Murphy calmed down. The commotion resulted in Murphy's mother exiting the house. Murphy's mother then approached the officers and yelled at the officers that they were not going to take her son. The officers detained Murphy's mother. Observing his mother in handcuffs, Murphy resumed being animated, and addressing the officer's actions against his mother, he screamed at the "top of his lungs," stating, "you can't do this." (Tr. Vol. II, p. 39).

[9] The following day on October 3, 2018, in Cause Number 32D05-1811-CM-1668(Cause No. 1668), the State filed another Information, charging Murphy with Class A misdemeanor resisting law enforcement, and Class B misdemeanor disorderly conduct. On November 16, 2018, Cause No. 1668 was transferred to the Hedrick Superior Court to be heard with Cause No. 1664. On May 16, 2019, the trial court conducted a joint bench trial for both Causes. At the close of the evidence, the trial court found Murphy guilty on all Counts. The trial court then sentenced Murphy to concurrent sentences of 365 days for intimidation, 365 days for resisting law enforcement, and 180 days for

disorderly conduct.  The trial court, however, suspended Murphy's sentence to probation.

Murphy now appeals.  Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Murphy claims that there was insufficient evidence to convict him of intimidation, resisting law enforcement, and disorderly conduct.  When reviewing a claim of insufficient evidence, it is well-established that our court does not reweigh evidence or assess the credibility of witnesses.  *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013).  Instead, we consider all of the evidence, and any reasonable inferences that may be drawn therefrom, in a light most favorable to the verdict.  *Id*.  We will uphold the conviction "'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'"  *Id*. (quoting *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004)).

## II. *Intimidation*

Murphy first argues that there "is absolutely no evidence that [his] threat to harm Fassett was made in retaliation for a prior lawful act."  (Appellant's Br. p. 9).  To prove intimidation, the State was required to establish beyond a reasonable doubt that:  "A person who communicates a threat to another

person, with the intent: . . . (2) That the other person be placed in fear of retaliation for a prior lawful act . . . commits intimidation, a Class A misdemeanor." I.C. § 35-45-2-1(a)(2). Murphy appears to be challenging the sufficiency of the second element.

In *Chastain v. State*, 58 N.E.3d 235, 241 (Ind. Ct. App. 2016), *trans. denied*, we held that "a conviction under the intimidation statute should not depend upon a precise parsing of the threatening language used by a defendant or a detailed timeline of when a threat was issued in relation to a prior lawful act." (internal citations omitted). Rather, what is required is that there be a clear *nexus* between the prior lawful act and the defendant's threat. *See id*. (emphasis added).

On August 20, 2018, Murphy drove up to Fassett while she was delivering mail for the USPS, parked his truck and exited, and then repeatedly demanded his check from Fassett. When Fassett stated that she did not have Murphy's check, Murphy repeatedly threatened to hurt Fassett. Fasset committed a lawful act— refusing to deliver a nonexistent check to Murphy—and Murphy immediately threatened to harm Fassett. Thus, it was reasonable for the trier of fact to find that there was a clear nexus between that prior lawful act and Murphy's threat to harm Fassett. Fassett was engaged in a prior lawful act, and Murphy's threat was in direct response to Fassett's prior lawful act. Therefore, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support Murphy's intimidation conviction.

## III. *Resisting Law Enforcement*

To convict Murphy of Class A misdemeanor resisting law enforcement, the State was required to prove beyond a reasonable doubt that Murphy knowingly or intentionally forcibly resisted, obstructed, or interfered with a law enforcement officer or a person assisting the officer while the officer was lawfully engaged in the execution of the officer's duties. I.C. § 35-44.1-3-1(a)(1).

Murphy argues that "[i]t is also difficult to see how refusing to leave one's house or simply pulling away from an officer constitutes forceful resistance." (Appellant's Br. p. 11). When Officer Jellison arrived at Murphy's home, he informed Murphy that he had a warrant for his arrest. Officer Jellison asked Murphy "approximately two (2) to three (3) times to step out of the house." (Tr. Vol. II, p. 43). Murphy refused to exit his house and at that point, Officer Jellison put his "right hand on the cusp of [Murphy's] right elbow, and [his] left hand on [Murphy's wrist" so that he "could gain control and place [Murphy] in cuffs." (Tr. Vol. II, p. 43). Officer Jellison then attempted to pull Murphy out of the house, but Murphy pulled away multiple times. With the help of another officer, Officer Jellison forcefully removed Murphy from the house. Because Murphy was attempting to kick the officers, he was forced to sit down on the ground.

Based on the evidence, the State presented sufficient evidence beyond a reasonable doubt that Murphy forcibly resisted law enforcement. *See Walker v.*

*State*, 998 N.E.2d 724, 725 (Ind. 2013) ("A person forcibly resists a police officer when he uses strong, powerful, violent means to impede an officer in the lawful execution of his duties.")

## IV. *Disorderly Conduct*

[18]     Lastly, to prove that Murphy committed Class B misdemeanor disorderly conduct, the State needed to prove beyond a reasonable doubt that Murphy recklessly, knowingly, or intentionally made unreasonable noise and continued to do so after being asked to stop. *See* I.C. § 35-45-1-3(a)(2).

[19]     Murphy contends that he was engaging in political speech at the time of his arrest, and thus, his outbursts were protected by Article 1, section 9 of the Indiana Constitution. Article 1, section 9 provides: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible."

[20]     In reviewing the constitutionality of Indiana Code section 35-45-1-3 as applied to a defendant, we employ a two-step analysis. "First, we must determine whether state action has restricted a claimant's expressive activity; second, if it has, we must decide whether the restricted activity constituted an 'abuse' of the right to speak." *Blackman v. State*, 868 N.E.2d 579, 584-85 (Ind. Ct. App. 2007) (citing *Whittington v. State*, 669 N.E.2d 1363, 1367 (Ind. 1996)).

[21]     Here, the record reveals that Murphy was arrested for disorderly conduct after he screamed at Officer Jellison and other officers during his arrest despite being asked to stop several times. *See Johnson v. State*, 719 N.E.2d 445, 448 (Ind. Ct. App. 1999) (holding that a person's conviction for making unreasonable noise based solely on his loud speaking during a police investigation constitutes state action restricting the claimant's expressive activity). Murphy has established that the State restricted his expressive activity, therefore, the first prong is satisfied.

[22]     Turning to the second prong, it

> hinges on whether the restricted expression constituted political speech. If the claimant demonstrates under an objective standard that the impaired expression was political speech, the impairment is unconstitutional unless the State demonstrates that the magnitude of the impairment is slight or that the speech amounted to a public nuisance such that it inflict[ed] particularized harm analogous to tortious injury on readily identifiable private interests. If the expression, viewed in context, is ambiguous, it is not political speech, and we evaluate the constitutionality of the impairment under standard rationality review.

*Barnes v. State*, 946 N.E.2d 572, 577 (Ind. 2011), *adhered to on reh'g*, 953 N.E.2d 473 (Ind. 2011).

[23]     At the bench trial, Officer Jellison testified that during the arrest, Murphy challenged the validity of the warrant. Officer Jellison stated that Murphy repeatedly yelled at the officers that he "didn't need to come with [the

officers]," the warrant was not "good", and he had "been pardoned for his crimes." (Tr. Vol. II, p. 49). Murphy additionally stated that "he wasn't responsible for whatever the original charge was on the warrant because he had been pardoned by Donald Trump." (Tr. Vol. II, p. 51). Also, evidence was presented that when Murphy observed his mother in handcuffs, Murphy, who had complied with the officers' demand to remain quiet, loudly protested her arrest by stating, "you can't do this." (Tr. Vol. II, p. 39). Murphy subsequently testified that although he was not a "big fan of the constitution," he at least had a "constitutional right" to know "what he was being arrested for." (Tr. Vol. II, p. 54). In his brief, Murphy contends that he "did not believe the officers were engaged in a lawful arrest," and while his outbursts were not delivered in a "sophisticated manner," they were political expressions, and are therefore protected. (Appellant's Br. p. 14).

[24] This court has repeatedly concluded that where the defendant's speech was directed exclusively at state actors and focused exclusively on the actions or conduct of state actors, the speech is political. For example, in *Dallaly v. State,* 916 N.E.2d 945, 953 (Ind. Ct. App. 2009), we concluded that the aim or focus of the defendant's expressive activity was to criticize the actions of the police officers and constituted political expression. In *U.M. v. State,* 827 N.E.2d 1190, 1193 (Ind. Ct. App. 2005), we held that defendant's speech in regard to his companion's inability to hold up his arms was an expression regarding the legality and appropriateness of police conduct toward his companion and was political speech. Lastly, in *Johnson v. State,* 747 N.E.2d 623, 630-31 (Ind. Ct.

App. 2001), we held that the defendant criticized the conduct of an official acting under color of law, therefore, his speech was protected political speech.

[25] Here, during his encounter with the officers, notwithstanding his claim that he had been pardoned by President Trump, Murphy loudly protested the legality of the warrant, and the appropriateness of police conduct toward him and his mother. Indeed, Murphy's statements criticized the conduct of an official acting under color of law. *See Johnson,* 747 N.E.2d at 630. Thus, Murphy's speech constituted political speech as the focus of his expressive activity was to criticize the actions of Officer Jellison and others in arresting him and his mother. *See Shoultz v. State*, 735 N.E.2d at 826-27 (holding that Shoultz engaged in protected political speech when he asked the arresting police officer what the problem was and why he was bothering other people, demanded whether the officer had a warrant to be on the property, and requested that the officer leave if he did not have a warrant), *trans. denied*. Accordingly, Murphy has met the second prong of the test.

[26] If the claimant demonstrates under an objective standard that the impaired expression was political speech, the impairment is unconstitutional unless the State demonstrates that the "magnitude of the impairment" is slight or that the speech amounted to a public nuisance such that it "inflict[ed] 'particularized harm' analogous to tortious injury on readily identifiable private interests." *Barnes*, 946 N.E.2d at 577 (quoting *Whittington*, 669 N.E.2d at 1370).

In the instant case, Officer Jellison and the other officers described Murphy's protests as loud. However, we cannot say that the State demonstrated that the magnitude of the impairment was slight. Nor can we say that the harm suffered by Murphy's neighbors rose above the level of a fleeting annoyance or that the State demonstrated that Murphy's loud protests diverted the officers' attention away from the task at hand, *i.e.*, arresting Murphy due to Murphy's speech.

Accordingly, we conclude that Murphy's speech was protected political speech and did not constitute an abuse of the right to free speech under the Indiana Constitution. We, therefore, reverse Murphy's Class B misdemeanor disorderly conduct conviction.

# CONCLUSION

Based on the foregoing, we conclude that the State presented sufficient evidence beyond a reasonable doubt to convict Murphy of his intimidation and resisting law enforcement offenses. However, we reverse Murphy's conviction for Class B misdemeanor disorderly conduct after concluding that Murphy's speech was protected political speech and did not constitute an abuse of the right to free speech under the Indiana Constitution.

We affirm in part, and reverse in part.

Baker, J. and Brown, J. concur